## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

ADRIAN COLLEGE,                           Case No. _9:22-cv-80641_____

           Plaintiff,

v.

ANTHOLOGY, INC.,

           Defendant.

---

## COMPLAINT

Plaintiff, Adrian College ("Adrian"), through its attorneys, VARNUM LLP, hereby states for its Complaint against Anthology, Inc., formerly Campus Management Corp. ("Anthology"), as follows:

## JURISDICTION AND VENUE

1.    Adrian is a Michigan non-profit corporation with its campus and principal location in Adrian, Michigan.

2.    Anthology is a Florida profit corporation with its headquarters in Boca Raton, Florida.

3.    In July 2020, Campus Management Corp. merged with companies named Campus Labs and iModules, and together these entities became Anthology.

4.    Anthology assumed the contractual liabilities of Campus Management Corp. upon the merger.

5.    Federal diversity jurisdiction exists pursuant to 28 U.S.C. § 1332.  Adrian is a Michigan corporation with its principal place of business in Michigan.  Anthology is a Florida corporation with its principal place of business in Florida.  Therefore, complete diversity of

citizenship exists.  The amount in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000.

6.     Venue in the Southern District of Florida is proper pursuant to 28 U.S.C. § 1391 because Anthology is located in this District, a substantial part of the events or omissions on which the claims asserted herein are based occurred in this District, and the subject contract was executed in the District.

7.     Additionally, Anthology has consented to venue in the Southern District of Florida, as pursuant to Section 16.2 of the Master Agreement, "any controversy or claim, . . . arising out or related to this Agreement, shall be maintained exclusively in the jurisdiction and venue of the courts sitting in and for Palm Beach County and the Southern District of Florida."  See Master Agreement, **Exhibit A** at 9.

8.     In Section 16.1 of the Master Agreement, Adrian and Anthology agreed that "prior to commencing any legal action, all disputes between them shall be submitted for informal resolution to their respective chief operating officers or his/her authorized designee with power to bind his/her respective company" at a meeting that is to take place within ten days after the submission of the dispute.  See Master Agreement, **Exh. A** at 9.

9.     Adrian submitted the dispute for informal resolution on December 17, 2021.

10.    Adrian and Anthology met for informal resolution on December 21, 2021 and were unable to reach a resolution.

## GENERAL ALLEGATIONS

11.    Plaintiff incorporates by reference the allegations in the above paragraphs as though fully set forth herein.

12.     Before the parties had entered into a contract, Anthology made several representations to Adrian, including that "Campus Management has a proven, higher education-specific solution that can provide tremendous value and results to Adrian College" and can "optimize your use of technology" because Anthology has "seen similar results within our client community." See 5/13/2015 Correspondence, **Exhibit B.**

13.     Anthology represented that the software system and services it provides "unites departments, campuses, and workflows while enabling flexible terms and financial aid options" which allows for "a 360-degree view of every department's interactions with each student, helping you boost enrollment, retention, and placement results."  See 4/25/2017 Proposal, **Exhibit C**.

14.     Anthology represented that its "technology solutions and services help transform academic delivery, student success, and operational efficiency across your institution."  See 3/17/2018 Letter, **Exhibit D**.

15.     Anthology represented that it has "worked with thousands of higher education institutions such as Adrian College providing education leaders with a way to streamline interdepartmental processes that provide cost savings and improve overall operational efficiency" and that its software system "provides a flexible and agile solution."  See 7/7/2015 Correspondence, **Exhibit E**.

16.     Anthology represented that "[w]e currently partner with several private and public MI institutions" and "currently work with over 1,700 institutions worldwide and our solutions have proven to help with the recruitment/enrollment/retention of non-traditional students."  See 6/29/2016 Correspondence, **Exhibit F**.

17.     When Adrian requested that Anthology provide data regarding the number of clients Anthology was currently servicing, Anthology replied "Total number of Campus

Management higher education clients: 1,017. Total number of Campus Management higher ed clients on CampusNexus CRM: 97."  See 5/1/2018 Correspondence, **Exhibit G**.

18.     Anthology, in a sales pitch to Adrian, told Adrian that the Product was "deployed and fully functional at multiple clients."

19.     Anthology, in a meeting with Adrian's President before an agreement had been reached, told Adrian directly that "our existing clients who are similar to Adrian College are very satisfied.  You have my word.  You will be extremely satisfied with our implementation team and the products you are contracting for."

20.     On May 18, 2018, Adrian and Anthology (collectively "the Parties") executed the Master Agreement for Software as a Service (SaaS), Software, and Professional Services, attached as **Exh. A**, Statement of Work No. 2457903, attached as **Exhibit H**, Statement of Work No. 24579035, attached as **Exhibit I**, and Addendum to the Master Agreement for Software as a Service, Software, and Professional Services, attached as **Exhibit J** (these documents, together with the schedules and exhibits attached thereto collectively, the "Agreement").

21.     Adrian subscribed to Anthology's Premium SaaS Tier, which included four modules; CampusNexus Student ("CNS"), CampusNexus CRM ("CRM"), CampusNexus Finance, HR & Payroll ("CNF"), and Talisma Fundraising ("Talisma") (these four modules collectively, "the Product").  See Master Agreement, **Exh. A** at 12.

22.     CNS is a Student Information System ("SIS"), which is a software solution designed to help colleges track and manage all their student data, including but not limited to grades, attendance, behavioral information, enrollment, and payments.

23.     Adrian contracted for CNS to replace its legacy SIS ("Blackbaud"), which will no longer be supported as of the summer of 2022.

24.     Under the Agreement, Anthology made several promises, representations, and warranties to Adrian.

25.     Anthology agreed to "deploy and administer [the Product]."   See Master Agreement, **Exh. A** at 3.

26.     Anthology agreed to "provide [the Product] to and for the benefit of [Adrian] . . . and use industry practices and methods to provide [the Product] to [Adrian]."   See Master Agreement, **Exh. A** at 3.

27.     Anthology agreed to develop and deliver a detailed project schedule to Adrian for review and approval.  See Statement of Work 2457903, **Exh. H** at 4.

28.     Anthology agreed to "[c]omplete all configuration, data migration, and coding for solution"; "[p]rovide detailed testing plans and conduct testing"; and "[r]esolve any coding and solution issues identified in testing."  See Statement of Work 2457903, **Exh. H** at 5.

29.     Anthology agreed to "be responsible for using reasonable diligence to correct verifiable and reproducible Errors when reported to [Anthology] in accordance with [Anthology's] standard reporting procedures.  [Anthology] shall, within a reasonable time of verifying that such an Error is present, initiate work in a diligent manner toward development of an Error Correction." See Master Agreement, **Exh. A** at 18.

30.     Anthology agreed to be responsible for the Data Migration programming code, delivery of data spins, initial training, and support for data validation throughout the Agreement. See Statement of Work 2457903, **Exh. H** at 6.

31.     Anthology agreed to be responsible for converting certain data regarding student records, general ledger, employee records, and donor records into CNS.  See Statement of Work 2457903, **Exh. H** at 6.

32.     Anthology agreed to "dedicate personnel necessary to perform its responsibilities hereunder."  See Master Agreement, **Exh. A** at 10.

33.     Anthology agreed to "perform all Professional Services in a professional and workmanlike manner."  See Master Agreement, **Exh. A** at 8.

34.     Anthology agreed that "the Professional Services and Deliverables shall substantially conform in all material respects to the descriptions in the Statement of Work."  Master Agreement, **Exh. A** at 8.

35.     Anthology agreed that, in addition to the Product, "[Adrian] may request services . . . not otherwise covered in this Agreement pertaining to the [Product] . . . provided that such assistance, if agreed to be provided by [Anthology], shall be subject to [Anthology's] standard rates."  See Master Agreement, **Exh. A** at 19.

36.     Anthology agreed that "in the event a delay in [Anthology's] performance is caused solely by [Anthology's] actions, additional costs resulting solely and directly from such delay will not be charged to Adrian."  See Addendum, **Exh. J**.

37.     Prior to entering the Agreement, Anthology provided Adrian with a sample estimated timeframe, indicating that all four modules of the Product would be able to be implemented within 17 months of the project start date.  At the time the Agreement was executed, the Parties agreed to set the date at which Anthology would fully deliver, implement, and have the Product ready for Adrian's use (the "Go-Live Date") at a later time.  The Parties agreed that the Parties "will coordinate the actual start date after full execution of this SOW."  See Statement of Work 2457903, **Exh. H** at 8.

38.     Shortly after executing the Agreement, Adrian indicated that deploying the four modules in phases was its preferred implementation strategy, with CNS Go-Live first, followed by the implementation of CNF and CRM, and finally Talisma.

39.     Adrian informed Anthology that Adrian's Subject Matter Experts ("SMEs") were necessarily focused on obtaining HLC re-accreditation for the college.  The Parties agreed to delay the beginning of the project until after Adrian received HLC re-accreditation and was able to hire a new IT employee as Adrian's Project Manager, and further agreed to establish the Go-Live Date at that point.

40.     SMEs were Adrian employees designated as the point persons for the Anthology project for their respective departments, including Academic Records, Admissions, Athletics, Financial Aid, Housing, and Student Accounts (each, a "Functional Area").

41.     Throughout the implementation process, there was a consistent pattern of employee turnover at Anthology which hindered the attempted implementation and caused several significant delays to the process.  Anthology provided Project Managers and Implementation Consultants dedicated to Adrian's implementation specifically in order to facilitate a successful implementation.  However, during Adrian's implementation, Adrian had to work with five different Project Managers and eight different Implementation Consultants from Anthology due to excessive employee turnover.  Each time a new Anthology employee was assigned to Adrian's implementation, the new employee had to be brought up to speed and "trained" by Adrian, which cost the implementation significant time.

42.     Adrian hired a new IT Director to be Adrian's Project Manager for the implementation of the Product in May 2019 and requested that Anthology begin the process of deploying the Product.  When Anthology's first Project Manager left, Anthology took over a month

to assign a second Project Manager to Adrian, and took another entire month to assign a third Project Manager when Anthology's second Project Manager passed away shortly after being assigned.

43.     After Anthology finally assigned adequate personnel to Adrian's implementation, the Parties engaged in Kick-Off Week and commenced work on the project, including blueprinting sessions, introductions to the CNS portal, and initial configuration of the CNS database.

44.     In October 2019, Anthology provided an updated project schedule, identifying August 10, 2020 as the CNS Go-Live Date but explaining that this schedule "is a work in progress towards meeting a July go live. This shows an August timeframe, and we may be able to cut time . . . ." See 10/25/2019 Correspondence, **Exhibit K**.

45.     Adrian gave Anthology notice that CNS must have a Go-Live Date on or before July 14, 2020, CNF must have a Go-Live Date on or before June 4, 2021, and Talisma must have a Go-Live Date on or before December 21, 2020.  Anthology was informed that if the implementation was not complete within the timeline provided, Adrian would be forced to renew Blackbaud and other related applications for an additional year at significant expense.  See **Exhibit L**.

46.     Anthology assured Adrian that these dates would be met, responding that "[a]t this point and with the advanced notice I don't see this as being a problem in scheduling." See **Exhibit M**.

47.     Adrian created the scripts for the codes that were to be used to extract data during the Spins based on the Data Discovery Spreadsheet provided by Anthology, and uploaded the ColdFusion Component database (the "Database") to Anthology on March 2, 2020.  A ColdFusion Component database uses programming language to collect data and control the behavior of that

data through functions and components.  "Spins" are processes in which the data constructed in the Development Environment is extracted to the Test Environment so that the Parties can determine how well the software will work in its final form, the Production Environment.

48.     Adrian continued to fulfill all of its contractual obligations by dedicating skilled resources to the project and cooperating with Anthology throughout the implementation. Anthology represented to Adrian that its data looked very good compared to past customers and was one step ahead of where other customers typically are on their first spin attempts.

49.     Spin 1 was conducted on April 8, 2020, and Adrian began the data validation process for Spin 1 shortly thereafter, during which Adrian's Functional Areas ran tests on the data that was transferred into the Test Environment (Validation Tests) to identify and record issues that occurred during the data migration ("Data Validation").  This allows Anthology to fulfill its contractual duty to "initiate work in a diligent manner toward development of an Error Correction." See Master Agreement, **Exh. A** at 18.

50.     Out of the 157 Validation Tests that Adrian conducted during Data Validation for Spin 1, 55% failed and only 43% passed. Adrian identified a total of 117 issues that needed to be addressed during the issue resolution period. See **Exhibit N**.

51.     The number and severity of the issues noted in the testing spin was alarming, but Anthology represented that this was a normal part of the process and that the issues would be corrected before Spin 2.

52.     Adrian continued to fulfill all of its contractual obligations by providing updated versions of the Database and working diligently with Anthology to resolve the issues in preparation for Spin 2.

53.     After Anthology confirmed that the issues identified by Adrian during Data Validation for Spin 1 had been addressed, Spin 2 was subsequently conducted on May 21, 2020.

54.     Even though Adrian had dedicated substantial time with Anthology on issue resolution following Spin 1, 63% of the Validation Tests during Data Validation for Spin 2 failed. The total number of issues that Adrian had identified in the issue tracker climbed to 178 following Spin 2.  Many of the issues were the same as those identified during Spin 1.  See **Exhibit O**.

55.     After the number of issues identified with the Product during Spin 1 and Spin 2 made the spins a complete failure, Anthology informed Adrian that the agreed-upon July 2020 Go-Live Date would not be possible.

56.     Adrian pushed for an October 1, 2020 Go-Live Date for CNS, but Anthology's failure to timely remedy the issues forced the Parties to target a Go-Live Date in between the fall and spring semesters, on December 14, 2020.  Due to the importance of successfully installing the Product before Blackbaud expired, and the trouble that Anthology was having resolving the numerous issues with CNS, Adrian agreed to delay the implementation of CNF, CRM, and Talisma and focus all efforts on CNS until after CNS was able to Go-Live.

57.     Adrian demanded that Anthology confirm the issues had been resolved prior to conducting Spin 3.  Anthology indicated that all of the issues were addressed, and Spin 3 was conducted on October 2, 2020.

58.     Due to the high rate of failure during Data Validation of Spin 1 and Spin 2, Anthology's Data Services Team and Adrian's IT Team met for an initial review of Spin 3 to analyze whether critical issues were appearing in CNS, so that the Parties could attempt to resolve the major issues prior to engaging Adrian's SMEs for Data Validation.

59.     Due to the numerous issues identified shortly after Spin 3 was conducted, Anthology delayed Data Validation of Spin 3 so it could attempt to resolve more of the issues before Data Validation.

60.     Despite the substantial issues that remained following Spin 3, Anthology maintained in an update to the estimated project schedule provided on October 23, 2020 that the Go-Live Date for CNS was still expected to be December 2020.  See **Exhibit P**.

61.     Despite the extra measures undertaken by the Parties, such as Adrian's demand that Anthology confirm the issues had been resolved by Spin 3 and Anthology attempting to resolve the major issues prior to engaging the SMEs for Spin 3 Data Validation, the number of issues identified in the issue tracker after Data Validation for Spin 3 had grown to 367.  See **Exhibit Q**.

62.     Anthology, apparently sensing that it may fail to deliver a viable product, began attempting to suggest at this point, and throughout the remainder of the implementation process, that Adrian's Financial Aid Team contributed to the delays to the project schedule; however, this desperate ploy would only make sense if the issues with the Product were limited to the Financial Aid module.  Even if all of the Financial Aid results were removed from the equation entirely, 42% of the Validation Tests completed after Spin 3 failed.  *Id.*

63.     Once again, the Parties spent months working on issue resolution, attempting to correct the issues that were identified during Data Validation of Spin 3 so that the Product would be ready for what Anthology indicated would be the final testing Spin.

64.     The Product was such an abysmal disaster that the issue resolution period following Spin 3 had to be extended by several weeks.  Anthology then informed Adrian that, even though the original Go-Live Date had already been delayed by several months, Anthology would not be able to achieve the agreed-upon December 14, 2020 Go-Live Date for CNS.

65.     Anthology's failure to meet the delivery deadline was due to Anthology's failure to "[r]esolve any coding and solution issues identified in testing" and "be responsible for using reasonable diligence to correct verifiable and reproducible Errors when reported to [Anthology] in accordance with [Anthology's] standard reporting procedures," as was its contractual duty.  See Master Agreement, **Exh. A** at 18; Statement of Work 2457903, **Exh. H** at 5.

66.     After Anthology determined that it would be unable to deliver a functional product by the December 2020 Go-Live Date, Anthology proposed a new project timeline, adding an additional testing spin, Spin 4, and proposing a CNS Go-Live Date in June 2021.  Adrian pushed to instead target a CNS Go-Live Date of May 24, 2021, and Anthology agreed that the May date would be achievable.

67.     The Parties continued to work through course mapping and attempted to resolve the recurring issues related to course codes in preparation for Spin 4.  Spin 4 was initially conducted on March 1, 2021.

68.     Yet again, errors that were consistent throughout all four Spins were still persisting when Anthology conducted a smoke test shortly after Spin 4.  In fact, Spin 4 was a large step backwards for the project, as a myriad of new, unexpected issues were also uncovered during the initial review of the Test Environment.

69.     It was immediately clear based on the initial review of the Spin that Spin 4 was another utter failure, and it would be necessary to conduct yet another testing Spin before the Product could go live.  The failure was clear and obvious even before any Data Validation had been conducted.  Accordingly, in an effort to save time, Adrian demanded that Anthology work with Adrian's IT Team to attempt to resolve the many issues prior to engaging the SMEs for Data Validation.

70.     Adrian spent another full month working with Anthology to troubleshoot the many significant issues from Spin 4, including fixing the SQL code to identify the missing information in CNS, updating the Database in preparation to re-conduct Spin 4, and analyzing the mapping issues that continued to show up with course names.

71.     Anthology provided an updated project schedule on March 31, 2021, confirming that Anthology understood that the target date for CNS to Go-Live remained May 24, 2021. See **Exhibit R**.

72.     Anthology re-conducted Spin 4 in early April after the Parties had spent over a month attempting to address the lengthy list of issues with the Product, and Data Validation for the re-conducted Spin 4 began shortly thereafter.

73.     Yet again, Anthology had failed to fulfill its contractual obligations to "[r]esolve any coding and solution issues identified in testing."  Only six out of the dozens of issues that Anthology had allegedly resolved had actually been corrected; all of the other issues, which Anthology had confirmed to be resolved, re-occurred in the re-spin of Spin 4, in addition to several new issues that appeared after the re-spin.

74.     Adrian made it clear to Anthology that yet another delay past the May 24 Go-Live Date would be unacceptable and requested additional resources from Anthology to help resolve the numerous remaining issues from the failed re-spin of Spin 4 and give the Parties a chance to meet the May 24 Go-Live Date.

75.     Instead, Anthology's third Project Manager left the company, once again leaving Adrian without a Project Manager at Anthology who was familiar with Adrian's implementation. Anthology's Implementation Consultant, who had worked extensively on Adrian's implementation, was reassigned within Anthology and no longer available to assist Adrian.

76. With a fourth Project Manager and another Implementation Consultant both starting within a few weeks of each other, Anthology's communication and understanding of the timeline suffered greatly.

77. Anthology admitted that it would fail yet again to meet the agreed upon May 24 Go-Live Date for CNS.

78. Anthology proposed another new CNS project timeline, adding a fifth testing Spin and setting the new Go-Live Date for CNS as June 21, 2021.

79. Adrian informed Anthology that "[w]e CANNOT miss this new date," and Anthology indicated that it understood the importance of this deadline.

80. Due to the numerous departures from Anthology's team during Adrian's implementation, Adrian was entitled to a credit of 100 service hours under the Agreement.  See Addendum, **Exh. J** at 2.

81. Adrian requested that the credit of 100 hours be utilized by Anthology's previous Implementation Consultant, so that Adrian would be able to work with a point of contact at Anthology that possessed knowledge of Adrian's situation.  Although Anthology responded to Adrian's request by reporting that Adrian's previous Implementation Consultant "will still be able to participate in the workup to Adrian's go live," she was ultimately not made available to Adrian and ended up working minimally with Adrian over the remainder of the Agreement.

82. The Parties worked to reconfigure the Database in preparation for Spin 5, and Adrian made all of Anthology's recommended changes.  Adrian inquired into Anthology's progress working through the issues that remained in the issue tracker after Spin 4 in order to confirm that Spin 5 would not result in a similar failure to the previous four spins, to which Anthology responded "[a]s of this morning, all issues are resolved."  **Exhibit S**.

14

83.     However, it became clear shortly after Spin 5 was conducted on May 7, 2021 that not all of the issues with Anthology's program had been resolved.

84.     Several critical issues with CNS were immediately identified by Anthology in a smoke test following Spin 5, and the list of issues kept growing as Adrian once again worked through the Data Validation process.

85.     Despite Anthology having five testing spins and five corresponding issue resolution periods to remedy the issues with the Product, Anthology determined that the number of issues that persisted in the system required another spin, and more importantly, another significant delay beyond the June 21 Go-Live Date, which had been emphasized as critical by Adrian and agreed to by Anthology.

86.     The Parties decided on a December 20, 2021 Go-Live Date, nearly 18 months later than the originally agreed-upon Go-Live Date of July 1, 2020.

87.     Suspecting that the Product may not be viable, Adrian requested that Anthology provide testimonials from customers that have successfully implemented CNS and are currently utilizing the SIS. Anthology failed to produce any written testimonials, instead providing only short, general quotes from Anthology's website.

88.     The Parties continued Data Validation and issue resolution for Spin 5, but the process was consistently slowed by Adrian having to essentially train Anthology's fourth Project Manager and another Implementation Consultant, who remained unfamiliar with Adrian's implementation. Anthology's newly designated team consistently showed a basic misunderstanding of the progress and process of Adrian's implementation, such as not knowing that Adrian uses, per Anthology's instruction, the Data Conversion Resource Center ("DCRC") issue tracker to report issues, stating that Anthology did not know the status of work on the

integrations, and asking Adrian if it knew whether the DCRC issues with a Spin 4 designation are being worked on since the project is now on Spin 5.

89.     Adrian made it clear to Anthology that its subscription to Blackbaud, which Adrian had already been forced to extend due to Anthology's failure to timely implement the Product, would no longer be supported beginning in the summer of 2022.  In September 2021, Adrian made it clear that if the Agreement was going to continue, the system absolutely must Go-Live by December 20, 2021; extending the Go-Live Date for CNS past the December 2021 Go-Live Date was "entirely off the table."

90.     Adrian made three demands from Anthology during an executive review meeting on September 2, 2021:

a.     First, Anthology must tell Adrian whether the Product was truly viable and ready to be implemented, because if Anthology admitted that it sold Adrian the Product prematurely before it was functional, Adrian would end the implementation and seek other options for replacing Blackbaud.  However, CNS must Go-Live by December 20, 2021 if Anthology tells Adrian that CNS is a legitimate system.  Anthology assured Adrian that the Product is viable.

b.     Second, considering Anthology's answer that CNS was ready to be implemented, Anthology must provide, in writing, exactly what it needed Adrian to do in order to meet the Go-Live Date in December 2021.

c.     Third, because it appeared that Anthology had been having Adrian essentially build the Product for them, Adrian demanded a list of other colleges that had successfully implemented and were using CNS.  Anthology responded that there are "ten or eleven" schools that are live on CNS but "not all of them look like Adrian."

91.     The Parties' executive teams held another meeting on September 7, 2021, to discuss Anthology's proposal to meet the demands made by Adrian during the September 2 meeting.

92.     In this meeting, Anthology admitted that at the time of the contract, Anthology was still "building" the Product so that it could be implemented at a school like Adrian, but assured Adrian that "[a]t this point in time, we do believe we have a product that will work for a school like yours."

93.     Anthology admitted that "the process of implementation from 2018 until now has probably been rough because . . . the functionality needed to go live was not there yet."

94.     Anthology further admitted that the product was still not fully functional, stating "we have more leaps to go, and we probably always will."

95.     Anthology told Adrian that it "heard loud and clear the call to put together a plan to get Adrian live by December 20" and ensured Adrian that it did "have a plan to get you live by the 20th of December."

96.     Anthology promised Adrian that it "stands ready to deliver what we need to in terms of Anthology resources in order to meet the schedule that we are about to discuss."

97.     However, Anthology failed to provide the list of schools that had gone live on CNS despite Adrian following up twice.  When asked why Anthology has not provided the list of clients that it promised, Anthology assured Adrian that these clients exist, stating "We have found similar clients. We have 2 to 3. We want to make sure they are using the system and not just in implementation. Until we verify that we are not going to give you the list."

98.     Anthology acknowledged that Adrian faced significant risk if CNS did not Go-Live in December and provided Adrian with a plan (the "Plan") that allegedly would "lead to a Student go-live on December 20th, 2021."  **Exhibit T** at 3.

99.    According to the Plan, Adrian's Functional Areas would set aside twelve hours per week to work on Data Validation, testing the portal, and testing the integrations.

100.   Adrian included in the Plan an updated project schedule, which added testing Spin 6 and Spin 7 before the Go-Live Date of December 20, 2021. **Exh. T** at 4.

101.   Each Functional Area at Adrian committed a minimum of twelve hours per week to meetings with the Anthology team and satisfied the time commitment requirements set out by Anthology in the Plan.

102.   However, the fourth Project Manager who had been assigned to Adrian's implementation left Anthology, causing additional delays when Adrian once again had to bring a new Project Manager up to speed on the status of the implementation.

103.   At this point, it was clear that Anthology recognized that it would likely not be able to deliver a viable product.  Adrian began noticing and informed Anthology of misrepresentations in Anthology's documentation of the issues and Data Validation Test report.  Anthology was inputting false data into its reports, presumably to manufacture the appearance that Adrian was at least partially responsible for Anthology's failure to deliver a working SIS.

104.   For example, Anthology's DCRC analysis report indicated that there were 170 Validation Tests that Adrian had not completed for Data Validation of Spin 5, even though there were only 137 total tests in the DCRC.  Adrian showed Anthology that the real number of outstanding tests, according to Anthology's own system, was 31.  Additionally, even that number was inflated, as Anthology reported the Financial Aid team had not completed a single Validation Test despite Adrian's IT team watching the Financial Aid team passing and failing multiple tests.

105.   Similarly, many of the issues that Adrian documented in Anthology's issue tracker were being assigned back to Adrian with a request for "more information" in order to make it

appear that the issues were Adrian's responsibility rather than Anthology's. Anthology knew that Adrian had no other information to provide on these issues and did not request any specific information; all Adrian could do was identify areas that the Product was not working. Anthology was simply attempting to manipulate the issue tracker to make it seem as though it was Adrian that caused the delays in implementation.

106.    On September 29, 2021, Anthology provided an updated validation report, indicating that 126 of the 138 test cases had been completed, and nearly 60% of the tests had failed. **Exhibit U**. Anthology admitted that Adrian had made great progress on completing the tests, but that a "[d]eeper dive into the issues that have been reported in order to identify the root causes for the low quality and success numbers is needed." *Id.*

107.    Anthology's inept attempts to resolve the issues with Spin 5 continued for weeks longer than expected, causing Spin 6 to be delayed past the scheduled date in the Plan.

108.    On October 11, 2021, Anthology reported that Adrian had completed 100% of the Validation Tests, and 54% of the tests failed. Only 7 of the 72 failing tests were from Financial Aid, and every single Functional Area had at least one Validation Test fail. The Product was a complete failure across the board, and not one module within CNS was ready to Go-Live. **Exhibit V** at 5.

109.    Anthology provided a breakdown of the issues in the DCRC, showing a grand total of 610 issues with over 140 still open and unresolved. **Exh. V** at 6.

110.    Despite having full knowledge that Adrian could not delay the Go-Live Date past December, Anthology unequivocally informed Adrian that it would again fail to perform its contractual duties, as it would not deliver a functional CNS by December 20, 2021. Anthology requested a fifth substantial delay to the Go-Live Date in a call on October 14, 2021.

111.    During the call, Anthology admitted that Adrian was working diligently, but the issues with CNS were substantial. Anthology admitted that "everybody is all in and working hard" and the reason that a December 20, 2021 Go-Live Date was not attainable was "the mountain of issues that we've got to get through to make the product viable."

112.    After Anthology told Adrian that it would breach the contract by failing to deliver a functional CNF by the agreed upon Go-Live Date, President Docking from Adrian sent a letter to Anthology, informing Anthology that Adrian is ending the relationship effective immediately. See 10/14/2021 Letter, **Exhibit W**.

113.    From 2018 through October 2021, Adrian consistently kept its system and the Anthology Environments upgraded to the most recent updates released by Anthology.

114.    Adrian thoroughly reported all of the issues identified after each Spin to the DCRC throughout the attempted implementation.

115.    In addition to the fact that the Product was completely dysfunctional and could not be implemented, significant limitations to Anthology's system were discovered during the implementation attempts which would have reduced the benefit Adrian received from CNS even if Anthology had been able to get the Product to work as it was designed.

116.    These previously undisclosed limitations include, but are not limited to, the inability to create simple lists from data in CNS, the inability to edit whether certain fields on an application are required, and the inability to process information in certain applications without manually inputting the data.

117.    Therefore, CNS would never have performed as Anthology portrayed, and a successful implementation of CNS would have led to a significant additional workload for the Functional Areas at Adrian.

118.   In fact, since October 2021, Adrian has learned that several other colleges were likewise defrauded into buying the Product.  Some schools actually "went live" with the Product only to suffer disastrous consequences due to operational failures of multiple components of the Product.  Other schools, like Adrian, never reached a point where the Product could even "go live."

119.   Pursuant to Section 16.2 of the Master Agreement, Adrian and Anthology agreed that "[t]he prevailing Party shall be entitled to reimbursement of reasonable attorneys' fees and costs" following litigation of "any controversy or claim, whether based on contract, tort, or other legal theory, arising out or relating to this Agreement." See Master Agreement, **Exh. A** at 9.

## COUNT I
## FRAUD IN THE INDUCEMENT

120.   Plaintiff incorporates by reference the allegations in the above paragraphs as though fully set forth herein.

121.   Prior to Adrian entering the Agreement with Anthology, Anthology continuously misrepresented to Adrian, both orally in multiple presentations and site visits and in writing in letters, e-mail correspondence, and proposals, that the Product was functional and ready to be installed, that the Product was a flexible solution that would improve operational efficiency, and that the Product had been successfully implemented at numerous institutions similar to Adrian.

122.   Anthology made the representations in an attempt to convince Adrian to enter the Agreement, under which Anthology would provide the Product to Adrian, replacing Blackbaud.

123.   Specifically, Anthology represented to Adrian that "Campus Management has a proven, higher education-specific solution that can provide tremendous value and results to Adrian College" and can "optimize your use of technology" because Anthology has "seen similar results within our client community."  See 5/13/2015 Correspondence**, Exh. B**.

124.    Anthology represented that the Product "unites departments, campuses, and workflows while enabling flexible terms and financial aid options" which allows for "a 360-degree view of every department's interactions with each student, helping you boost enrollment, retention, and placement results."  See 4/25/2017 Proposal, **Exh. C**.

125.    Anthology expressed to Adrian that Anthology's "technology solutions and services help transform academic delivery, student success, and operational efficiency across your institution."  See 3/17/2018 Letter, **Exh. D**.

126.    Anthology explicitly told Adrian that it has "worked with thousands of higher education institutions such as Adrian College providing education leaders with a way to streamline interdepartmental processes that provide cost savings and improve overall operational efficiency" and that the Product "provides a flexible and agile solution."  See 7/7/2015 Correspondence, **Exh. E**.

127.    Similarly, Anthology represented to Adrian that "[w]e currently partner with several private and public MI institutions" and "currently work with over 1,700 institutions worldwide and our solutions have proven to help with the recruitment/enrollment/retention of non-traditional students."  See 6/29/2016 Correspondence, **Exh. F**.

128.    When Adrian was weighing the decision to enter the Agreement and directly asked Anthology for data regarding the number of clients Anthology was currently servicing, Anthology replied "Total number of Campus Management higher education clients: 1,017. Total number of Campus Management higher ed clients on CampusNexus CRM: 97."  See 5/1/2018 Correspondence, **Exh. G**.

129.    Anthology told Adrian prior to entering the Agreement that the Product was "deployed and fully functional at multiple clients."

130.     Anthology represented that "our existing clients who are similar to Adrian College are very satisfied.  You have my word.  You will be extremely satisfied with our implementation team and the products you are contracting for."

131.     None of the representations Anthology made about the quality, capabilities, or prior successful implementations of the Product were true.  In fact, the Product, which was represented to be existing, didn't exist at all and was merely conceptual.

132.     The Product negatively impacted Adrian's overall operational efficiency, did not provide a 360-degree view of every department's interactions with each student, and the failure to provide a viable product prevented Adrian from streamlining interdepartmental processes or optimizing its use of technology.

133.     Adrian, justifiably relying on Anthology's misrepresentations, entered into the Agreement.

134.     At the time Anthology made these false representations, Anthology knew or should have known of their falsity.

135.     In fact, years after the representations were made, Anthology even admitted that at the time of the contract, it was still "building" the Product so that it could be implemented at a school like Adrian and explained that "the process of implementation from 2018 until now has probably been rough because . . . the functionality needed to go live was not there yet."

136.     This directly contradicts several representations made by Anthology to induce Adrian into entering the Agreement.  The fact that the basic functionality necessary for the Product to exist was "not there" when Anthology sold it to Adrian indicates that Anthology had actual knowledge that its representations regarding the quality, capabilities, or prior successful implementations of the Product were false.  At the very least, Anthology clearly should have

known that a product that was admittedly "not there yet" cannot be classified as a "proven" "solution" as was represented to Adrian.

137.     Additionally, Anthology knew at the time it represented to Adrian that the Product had been successfully implemented at numerous other institutions similar to Adrian that this representation was false.

138.     After the attempted implementation of the Product resulted in utter failure for nearly two years, Adrian demanded examples of colleges that currently operate Anthology's system.  Despite directly stating that Anthology has "worked with thousands of higher education institutions such as Adrian College" prior to Adrian entering the Agreement, Anthology failed to produce even a single example of a college similar to Adrian that currently successfully operates Anthology's system.  Rather, Anthology lied again, stating that there are "ten or eleven" schools that are live but "not all of them look like Adrian."  Shortly thereafter Anthology again contradicted its representation regarding the number of successful implementations, communicating that there are "two or three" schools that are live.  Still Anthology could not produce a single institution that has successfully implemented the product.  Ultimately, it became clear that instead of "thousands" as Anthology had fraudulently asserted to induce Adrian to enter the agreement, not one single school similar to Adrian has successfully implemented the Product.

139.     As a result of Adrian's reliance on Anthology's misrepresentations, Adrian suffered significant damages, including, but not limited to $1,312,132 in payments and thousands of hours wasted by Adrian's staff on a Product that Anthology knew was not ready.

140.     Due to the Agreement being induced by Anthology's fraud, the Agreement should be rescinded, and Adrian should be awarded the full amount of its damages, including any and all direct, incidental, and consequential damages related to the Agreement.

141.    Pursuant to Section 16.2 of the Master Agreement, Adrian requests reimbursement of its reasonable attorneys' fees and costs in bringing this action. See Master Agreement, **Exh. A** at 9.

**<u>COUNT II</u>**
**<u>BREACH OF CONTRACT</u>**

142.    Plaintiff incorporates by reference the allegations in the above paragraphs as though fully set forth herein.

143.    Anthology entered into the Agreement, a valid and binding contract with Adrian, promising to deploy and administer the Product, to develop corrections to any errors identified, to dedicate personnel necessary to perform its responsibilities, and to perform under the Agreement in a professional and workmanlike manner.

144.    The Product was unfinished, poorly designed, and not viable for implementation at a school like Adrian.

145.    Anthology materially breached the Agreement by failing to deploy a functional Product that "substantially conform[s] in all material respects to the descriptions in the Statement of Work" and to "perform all Professional Services in a professional and workmanlike manner." See Master Agreement, **Exh. A** at 8.

146.    Anthology further materially breached the Agreement by failing to "[r]esolve any coding and solution issues identified in testing" and to diligently develop corrections to, in Anthology's words, the "mountain of issues" that prevented a successful implementation of the Product.  See Statement of Work 2457903, **Exh. H** at 5.

147.    Due to the endless turnover of Anthology employees and the assignment of incompetent and incapable employees to Adrian's implementation, Anthology materially breached

25

the Agreement by failing to "dedicate personnel necessary to perform its responsibilities."  See Master Agreement, **Exh. A** at 10.

148.    Significant issues with the Product, which Anthology consistently failed to remedy, forced the Parties to delay the Go-Live Date for a total of nearly 18 months, from July 2020 to December 2020; then from December 2020 to May 2021; then from May 2021 to June 2021; then from June 2021 to December 2021.

149.    After the final delay, the Parties unequivocally agreed that CNS must Go-Live by December 20, 2021.

150.    Anthology repudiated the Agreement on October 14, 2021, telling Adrian that Anthology would not deliver a functional CNS by the agreed-upon delivery date of December 20, 2021.

151.    Adrian fulfilled its contractual obligations to make payments to Anthology, remunerating a total of $1,312,132.31 pursuant to the Agreement.

152.    Adrian dedicated skilled resources to the project, cooperated with Anthology throughout the implementation, and invested countless hours in working with Anthology, attempting to fix the numerous issues with the Product and achieve a successful Go-Live.

153.    Anthology's breach has caused Adrian to suffer damages, including, but not limited to, $1,312,132 in payments made to Anthology related to the Product, for which Adrian saw no return on investment, thousands of hours by Adrian's staff wasted on attempting to troubleshoot and develop a Product that never worked, and the replacement cost of locating and implementing a replacement SIS by June 2022.

154.    Anthology's breach was willful, as it knew at the time the contract was entered that the Product was not ready and therefore was certain not to be installed as warranted.

155.     Pursuant to Section 16.2 of the Master Agreement, Adrian requests reimbursement of its reasonable attorneys' fees and costs in bringing this action. See Master Agreement, **Exh. A** at 9.

WHEREFORE, Adrian requests of the Court the following relief:

A.     Rescind the Agreement, including the contractual limitation on damages, which was procured through Anthology's fraud;

B.     Order Anthology to provide a full and complete reimbursement to Adrian of all costs and expenses related to the Agreement;

C.     Award Adrian monetary damages, costs, and interest to the fullest extent of the law;

D.     Award Adrian punitive damages against Anthology;

E.     Award Adrian reimbursement of its reasonable attorneys' fees and costs pursuant to Section 16.2 of the Master Agreement; and

F.     Award all other relief to which Adrian may be entitled.

Respectfully submitted,

VARNUM LLP
Attorneys for Plaintiff

Dated:  April 25, 2022         By:     */s/ Joseph A. Bare*
                                        Joseph A. Bare (34116)
                                        999 Vanderbilt Beach Road, Suite 300
                                        Naples, FL  34108
                                        (239) 373-8022
                                        jabare@varnumlaw.com

                                        Aaron M. Phelps (Michigan Bar P64790)
                                        Gage M. Selvius (Michigan Bar P85559)
                                        Bridgewater Place, P.O. Box 352
                                        Grand Rapids, MI  49501-0352
                                        (616) 336-6000
                                        amphelps@varnumlaw.com
                                        gmselvius@varnumlaw.com
                                        (*pro hac vice* admission forthcoming)

27