**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

ADRIAN COLLEGE,

       Plaintiff,

                                  CASE NO.: 9:22-cv-80641-AMC

v.

ANTHOLOGY, INC.,

       Defendant.

_____/

**DEFENDANT ANTHOLOGY, INC.'S ANSWER,**
**AFFIRMATIVE DEFENSES AND COUNTERCLAIMS**

Defendant Anthology, Inc. ("**Anthology**" or "**Defendant**"), by its undersigned counsel, for its Answer, Affirmative Defenses and Counterclaim to Plaintiff Adrian College's ("**Plaintiff**" or "**Adrian**") Complaint (the "**Complaint**"), avers as follows:

**ANSWER**

1.      Anthology denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 1 of the Complaint, except admits that Adrian has a campus located in Adrian, Michigan.

2.      Anthology admits that it is a corporation organized under the laws of the state of Florida with a principal place of business of 5201 Congress Avenue, Suite 220, Boca Raton, Florida 33487, and otherwise denies the allegations of Paragraph 2 of the Complaint.

3.      Anthology admits the allegations of Paragraph 3 of the Complaint.

4.      Anthology states that Paragraph 4 of the Complaint contains conclusions of law and/or argument to which no answer is required.

5.      Anthology states that Paragraph 5 of the Complaint contains conclusions of law and/or argument to which no answer is required, except admits that Anthology is a Florida corporation with its principal place of business in Florida, and denies knowledge or information sufficient to form a belief as to the truth or falsity of Adrian's corporate status or principal place of business, and otherwise denies the allegations contained in Paragraph 5 of the Complaint.

6.      Anthology states that Paragraph 6 of the Complaint contains conclusions of law and/or argument to which no answer is required, except admits that Anthology has a principal place of business of 5201 Congress Avenue, Suite 220, Boca Raton, Florida 33487.

7.      Anthology states that Paragraph 7 of the Complaint contains conclusions of law and/or argument to which no answer is required, and refers to the Master Agreement dated May 18, 2018 (the "**Master Agreement**") whose full terms, obligations, and requirements are set forth therein.

8.      Anthology admits the allegations contained in Paragraph 8 of the Complaint only to the extent that they are consistent with the full terms and conditions set forth in the Master Agreement.

9.      Anthology admits the allegations contained in Paragraph 9 of the Complaint.

10.     Anthology denies the allegations contained in Paragraph 10 of the Complaint, except admits that representatives of Adrian and Anthology participated in a discussion on December 21, 2021, during which Adrian refused to participate in good faith negotiations to resolve this dispute.

11.     Anthology repeats and realleges its responses set forth above in paragraphs 1 to 10 as if fully set forth herein.

12.     Anthology refers to the cited May 13, 2015 correspondence for its contents, and otherwise denies the allegations contained in Paragraph 12 of the Complaint.

13.     Anthology refers to the cited April 25, 2017 document for its contents, and otherwise denies the allegations contained in Paragraph 13 of the Complaint.

14.     Anthology refers to the cited March 17, 2018 letter for its contents, and otherwise denies the allegations contained in Paragraph 14 of the Complaint.

15.     Anthology refers to the cited July 7, 2015 correspondence for its contents, and otherwise denies the allegations contained in Paragraph 15 of the Complaint.

16.     Anthology refers to the cited June 29, 2016 correspondence for its contents, and otherwise denies the allegations contained in Paragraph 16 of the Complaint.

17.     Anthology refers to the cited May 1, 2018 correspondence for its contents, and otherwise denies the allegations contained in Paragraph 17 of the Complaint.

18.     Anthology denies the allegations contained in Paragraph 18 of the Complaint.

19.     Anthology denies the allegations contained in Paragraph 19 of the Complaint.

20.     Anthology states that Paragraph 20 of the Complaint contains conclusions of law and/or argument to which no answer is required, admits the allegations only to the extent that they are consistent with the full terms and conditions set forth in the Master Agreement, Statements of Work Nos. 2457903 (the "**First Statement of Work**") and 2457905 (the "**Second Statement of Work**"), and the Addendum to the Master Agreement for Software as a Service, Software, and Professional Services (the "**Addendum**"), which should be referred to for their contents, and otherwise denies the allegations contained in Paragraph 20 of the Complaint.

21.     Anthology refers to the cited Master Agreement for its contents and otherwise denies the allegations contained in Paragraph 21 of the Complaint.

22.     Anthology admits the allegations contained in Paragraph 22 of the Complaint, except denies that CampusNexus Student tracks behavioral information.

23.     Anthology admits that Adrian contracted for CNS, and otherwise denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 23 of the Complaint.

24.     Anthology states that Paragraph 24 of the Complaint contains conclusions of law and/or argument to which no answer is required, admits the allegations contained in Paragraph 24 of the Complaint only to the extent that they are consistent with the full terms and conditions set forth in the Master Agreement, the First Statement of Work, the Second Statement of Work, and the Addendum, which should be referred to for their contents, and otherwise denies the allegations contained in Paragraph 24 of the Complaint.

25.     Anthology admits the allegations contained in Paragraph 25 of the Complaint only to the extent that they are consistent with the full terms and conditions set forth in the Master Agreement, the First Statement of Work, the Second Statement of Work, the Addendum, and all other documents comprising the agreement between Anthology and Adrian, which should be referred to for their contents, and otherwise denies the allegations contained in Paragraph 25 of the Complaint.

26.     Anthology admits the allegations contained in Paragraph 26 of the Complaint only to the extent that they are consistent with the full terms and conditions set forth in the Master Agreement, the First Statement of Work, the Second Statement of Work, the Addendum, and all other documents comprising the agreement between Anthology and Adrian, which should be referred to for their contents, and otherwise denies the allegations contained in Paragraph 26 of the Complaint.

27.     Anthology admits the allegations contained in Paragraph 27 of the Complaint only to the extent that they are consistent with the full terms and conditions set forth in the Master Agreement, the First Statement of Work, the Second Statement of Work, the Addendum, and all other documents comprising the agreement between Anthology and Adrian, which should be referred to for their contents, and otherwise denies the allegations contained in Paragraph 27 of the Complaint.

28.     Anthology admits the allegations contained in Paragraph 28 of the Complaint only to the extent that they are consistent with the full terms and conditions set forth in the Master Agreement, the First Statement of Work, the Second Statement of Work, the Addendum, and all other documents comprising the agreement between Anthology and Adrian, which should be referred to for their contents, and otherwise denies the allegations contained in Paragraph 28 of the Complaint.

29.     Anthology admits the allegations contained in Paragraph 29 of the Complaint only to the extent that they are consistent with the full terms and conditions set forth in the Master Agreement, the First Statement of Work, the Second Statement of Work, the Addendum, and all other documents comprising the agreement between Anthology and Adrian, which should be referred to for their contents, and otherwise denies the allegations contained in Paragraph 29 of the Complaint.

30.     Anthology admits the allegations contained in Paragraph 30 of the Complaint only to the extent that they are consistent with the full terms and conditions set forth in the Master Agreement, the First Statement of Work, the Second Statement of Work, the Addendum, and all other documents comprising the agreement between Anthology and Adrian, which should be

referred to for their contents, and otherwise denies the allegations contained in Paragraph 30 of the Complaint.

31.     Anthology admits the allegations contained in Paragraph 31 of the Complaint only to the extent that they are consistent with the full terms and conditions set forth in the Master Agreement, the First Statement of Work, the Second Statement of Work, the Addendum, and all other documents comprising the agreement between Anthology and Adrian, which should be referred to for their contents, and otherwise denies the allegations contained in Paragraph 31 of the Complaint.

32.     Anthology admits the allegations contained in Paragraph 32 of the Complaint only to the extent that they are consistent with the full terms and conditions set forth in the Master Agreement, the First Statement of Work, the Second Statement of Work, the Addendum, and all other documents comprising the agreement between Anthology and Adrian, which should be referred to for their contents, and otherwise denies the allegations contained in Paragraph 32 of the Complaint.

33.     Anthology admits the allegations contained in Paragraph 33 of the Complaint only to the extent that they are consistent with the full terms and conditions set forth in the Master Agreement, the First Statement of Work, the Second Statement of Work, the Addendum, and all other documents comprising the agreement between Anthology and Adrian, which should be referred to for their contents, and otherwise denies the allegations contained in Paragraph 33 of the Complaint.

34.     Anthology admits the allegations contained in Paragraph 34 of the Complaint only to the extent that they are consistent with the full terms and conditions set forth in the Master Agreement, the First Statement of Work, the Second Statement of Work, the Addendum, and all

other documents comprising the agreement between Anthology and Adrian, which should be referred to for their contents, and otherwise denies the allegations contained in Paragraph 34 of the Complaint.

35.     Anthology admits the allegations contained in Paragraph 35 of the Complaint only to the extent that they are consistent with the full terms and conditions set forth in the Master Agreement, the First Statement of Work, the Second Statement of Work, the Addendum, and all other documents comprising the agreement between Anthology and Adrian, which should be referred to for their contents, and otherwise denies the allegations contained in Paragraph 35 of the Complaint.

36.     Anthology admits the allegations contained in Paragraph 36 of the Complaint only to the extent that they are consistent with the full terms and conditions set forth in the Master Agreement, the First Statement of Work, the Second Statement of Work, the Addendum, and all other documents comprising the agreement between Anthology and Adrian, which should be referred to for their contents, and otherwise denies the allegations contained in Paragraph 36 of the Complaint.

37.     Anthology admits the allegations contained in Paragraph 37 of the Complaint only to the extent that they are consistent with the full terms and conditions set forth in the Master Agreement, the First Statement of Work, the Second Statement of Work, the Addendum, and all other documents comprising the agreement between Anthology and Adrian, which should be referred to for their contents, and otherwise denies the allegations contained in Paragraph 37 of the Complaint.

38.     Anthology denies the allegations contained in Paragraph 38 of the Complaint, except admits that Adrian wanted to implement CNS before other Anthology products.

39.     Anthology denies the allegations contained in Paragraph 39 of the Complaint, except admits that Adrian was responsible for a delay in the implementation of Anthology products.

40.     Anthology admits that Adrian employees were designated by Adrian to fulfill responsibilities required of them under the Master Agreement, the First Statement of Work, the Second Statement of Work, the Addendum, and all other documents comprising the agreement between Anthology and Adrian, and otherwise denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 40 of the Complaint.

41.     Anthology denies the allegations contained in Paragraph 41 of the Complaint.

42.     Anthology denies the allegations contained in Paragraph 42 of the Complaint, except admits that one of Anthology's Project Managers assigned to the Adrian implementation left the company in 2019, and another Project Manager passed away during that same year.

43.     Anthology denies the allegations contained in Paragraph 43 of the Complaint, except admits that a Kick-Off Week occurred, which included blueprinting sessions, introductions to the CNS portal and initial configuration of the CNS database.

44.     Anthology refers to the cited October 25, 2019 correspondence for its contents and otherwise denies the allegations contained in Paragraph 44 of the Complaint.

45.     Anthology refers to the cited January 10, 2020 correspondence for its contents and otherwise denies the allegations contained in Paragraph 45 of the Complaint.

46.     Anthology refers to the cited January 10, 2020 correspondence for its contents and otherwise denies the allegations contained in Paragraph 46 of the Complaint.

47.     Anthology denies the allegations contained in the first sentence of Paragraph 47 of the Complaint, except admits that Adrian was responsible for, and attempted to, extract and upload

data, and admits the allegations contained in the second and third sentences of Paragraph 47 of the Complaint.

48.     Anthology denies the allegations contained in Paragraph 48 of the Complaint.

49.     Anthology refers to the Master Agreement, the First Statement of Work, the Second Statement of Work, the Addendum, and all other documents comprising the agreement between Anthology and Adrian for their contents, admits that Spin 1 was conducted on or around April 2020, denies knowledge or information to form a belief as to the truth or falsity of the allegations of Paragraph 49 relating to Adrian's conduct, and otherwise denies the allegations contained in Paragraph 49 of the Complaint.

50.     Anthology refers to correspondence included in Exhibit N of the Complaint for its contents, and otherwise denies the allegations contained in Paragraph 50 of the Complaint.

51.     Anthology denies the allegations contained in Paragraph 51 of the Complaint.

52.     Anthology denies the allegations contained in Paragraph 52 of the Complaint.

53.     Anthology denies the allegations contained in Paragraph 53 of the Complaint, except admits that Spin 2 began in May 2020.

54.     Anthology refers to correspondence included in Exhibit O of the Complaint for its contents, and otherwise denies the allegations contained in Paragraph 54 of the Complaint.

55.     Anthology denies the allegations contained in Paragraph 55 of the Complaint.

56.     Anthology denies the allegations contained in Paragraph 56 of the Complaint, except admits that Adrian requested that the implementation of other Anthology products other than CNS be placed on hold and that the targeted "Go-Live Date" changed to December 14, 2020, at some point in time.

57.     Anthology denies the allegations contained in Paragraph 57 of the Complaint.

58.     Anthology denies the allegations contained in Paragraph 58 of the Complaint, except admits that Anthology attempted to resolve issues prior to Spin 3.

59.     Anthology denies the allegations contained in Paragraph 59 of the Complaint, except admits that Anthology, with Adrian's cooperation and consent, worked to resolve certain issues before the data validation process for Spin 3 commenced.

60.     Anthology refers to correspondence included in Exhibit P of the Complaint for its contents, and otherwise denies the allegations contained in Paragraph 60 of the Complaint.

61.     Anthology refers to correspondence included in Exhibit Q of the Complaint for its contents, and otherwise denies the allegations contained in Paragraph 61 of the Complaint.

62.     Anthology refers to correspondence included in Exhibit Q of the Complaint for its contents, and denies the allegations contained in Paragraph 62 of the Complaint, except admits that Adrian's Financial Aid Team caused significant delays to the project schedule, and that Anthology informed Adrian of that.

63.     Anthology denies the allegations contained in Paragraph 63 of the Complaint, except admits that Anthology attempted to resolve issues prior to Spin 4.

64.     Anthology denies the allegations contained in Paragraph 64 of the Complaint, except admits that the "Go-Live Date" was moved from December 14, 2020.

65.     Anthology refers to the Master Agreement, the First Statement of Work, the Second Statement of Work, the Addendum, and all other documents comprising the agreement between Anthology and Adrian for their contents, and otherwise denies the allegations contained in Paragraph 65 of the Complaint.

66.     Anthology denies the allegations contained in Paragraph 66 of the Complaint, except admits that the "Go-Live" date was moved to May 24, 2021, at some point in time.

67.     Anthology denies the allegations contained in Paragraph 67 of the Complaint, except admits that Spin 4 was conducted on or around March 2021.

68.     Anthology denies the allegations contained in Paragraph 68 of the Complaint.

69.     Anthology denies the allegations contained in Paragraph 69 of the Complaint.

70.     Anthology admits that Anthology continued to address issues identified during the Spin process, and otherwise denies the allegations contained in Paragraph 70 of the Complaint.

71.     Anthology refers to the document included in Exhibit R of the Complaint for its contents, and otherwise denies the allegations contained in Paragraph 71 of the Complaint.

72.     Anthology denies the allegations contained in Paragraph 72 of the Complaint, except admits that Spin 4 was redone on or around April 2021.

73.     Anthology denies the allegations contained in Paragraph 73 of the Complaint.

74.     Anthology denies the allegations contained in Paragraph 74 of the Complaint.

75.     Anthology denies the allegations contained in Paragraph 75 of the Complaint, except admits that an Anthology Project Manager assigned to the Adrian implementation left the company, and an Implementation Consultant was reassigned.

76.     Anthology denies the allegations contained in Paragraph 76 of the Complaint.

77.     Anthology denies the allegations contained in Paragraph 77 of the Complaint, except admits that the May 24, 2021 "Go-Live Date" was moved.

78.     Anthology admits the allegations contained in Paragraph 78 of the Complaint.

79.     Anthology denies the allegations contained in Paragraph 79 of the Complaint.

80.     Anthology refers to the Master Agreement, the First Statement of Work, the Second Statement of Work, the Addendum, and all other documents comprising the agreement between

Anthology and Adrian for their contents, admits that Anthology granted Adrian a credit of 100 service hours, and otherwise denies the allegations contained in Paragraph 80 of the Complaint.

81.     Anthology denies the allegations contained in Paragraph 81 of the Complaint.

82.     Anthology refers to the correspondence included in Exhibit S of the Complaint for its contents, and otherwise denies the allegations contained in Paragraph 82 of the Complaint.

83.     Anthology denies the allegations contained in Paragraph 83 of the Complaint.

84.     Anthology denies the allegations contained in Paragraph 84 of the Complaint.

85.     Anthology admits that it determined that a Spin 6 was necessary and suggested to Adrian that the "Go-Live Date" be moved, and otherwise denies the allegations contained in Paragraph 85 of the Complaint.

86.     Anthology admits that the parties agreed on a tentative "Go-Live Date" of December 20, 2021, at some point in time, and otherwise denies the allegations contained in Paragraph 86 of the Complaint.

87.     Anthology lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 87 concerning the reason for Adrian's request for references, admits that Adrian made a request for references of a specific kind of user of CNS, and otherwise denies the allegations contained in Paragraph 87 of the Complaint.

88.     Anthology denies the allegations contained in Paragraph 88 of the Complaint, except admits that Anthology continued to address issues identified during the Spin process.

89.     Anthology denies the allegations contained in Paragraph 89 of the Complaint.

90.     Anthology denies the allegations contained in Paragraph 90 of the Complaint.

91.     Anthology denies the allegations contained in Paragraph 91 of the Complaint, except admits that the parties' representatives held a meeting on September 7, 2021, to discuss the implementation.

92.     Anthology denies the allegations contained in Paragraph 92 of the Complaint.

93.     Anthology denies the allegations contained in Paragraph 93 of the Complaint.

94.     Anthology denies the allegations contained in Paragraph 94 of the Complaint.

95.     Anthology denies the allegations contained in Paragraph 95 of the Complaint.

96.     Anthology denies the allegations contained in Paragraph 96 of the Complaint, except admits that Anthology was committing resources to complete the Adrian implementation as quickly as possible.

97.     Anthology denies the allegations contained in Paragraph 97 of the Complaint.

98.     Anthology refers to the document included in Exhibit T of the Complaint for its contents, and otherwise denies the allegations contained in Paragraph 98 of the Complaint.

99.     Anthology denies the allegations contained in Paragraph 99 of the Complaint, except admits that on September 7, 2021, Anthology asked Adrian to commit 12 or perhaps more hours per week for each individual involved in the project moving forward.

100.    Anthology refers to the document included in Exhibit T of the Complaint for its contents, and otherwise denies the allegations contained in Paragraph 100 of the Complaint.

101.    Anthology denies the allegations contained in Paragraph 101 of the Complaint.

102.    Anthology denies the allegations contained in Paragraph 102 of the Complaint, except admits that a new Project Manager was assigned to the Adrian implementation.

103.    Anthology denies the allegations contained in Paragraph 103 of the Complaint.

104.    Anthology denies the allegations contained in Paragraph 104 of the Complaint.

105.    Anthology denies the allegations contained in Paragraph 105 of the Complaint, except admits that Adrian was not providing information requested of it.

106.    Anthology refers to the correspondence included in Exhibit U of the Complaint for its contents, and otherwise denies the allegations contained in Paragraph 106 of the Complaint.

107.    Anthology denies the allegations contained in Paragraph 107 of the Complaint.

108.    Anthology refers to the document included in Exhibit V of the Complaint for its contents, and otherwise denies the allegations contained in Paragraph 108 of the Complaint.

109.    Anthology refers to the document included in Exhibit V of the Complaint for its contents, and otherwise denies the allegations contained in Paragraph 109 of the Complaint.

110.    Anthology denies the allegations contained in Paragraph 110 of the Complaint, except admits that Anthology informed Adrian on October 14, 2021, that the "Go-Live Date" should move to January or February 2022.

111.    Anthology denies the allegations contained in Paragraph 111 of the Complaint, except admits that Anthology was committed to completing Adrian's implementation, and that issues needed to be resolved prior to implementation.

112.    Anthology refers to the letter included in Exhibit W of the Complaint for its contents, and otherwise denies the allegations contained in Paragraph 112 of the Complaint.

113.    Anthology denies the allegations contained in Paragraph 113 of the Complaint.

114.    Anthology denies the allegations contained in Paragraph 114 of the Complaint.

115.    Anthology denies the allegations contained in Paragraph 115 of the Complaint.

116.    Anthology denies the allegations contained in Paragraph 116 of the Complaint.

117.    Anthology denies the allegations contained in Paragraph 117 of the Complaint.

118.    Anthology denies the allegations contained in Paragraph 118 of the Complaint.

119.    Paragraph 119 contains conclusions of law for which no response is required, and refers to the Master Agreement, the First Statement of Work, the Second Statement of Work, the Addendum, and all other documents comprising the agreement between Anthology and Adrian for their contents.

120.    Anthology repeats and realleges its responses set forth above in paragraphs 1 to 119 as if fully set forth herein.

121.    Anthology denies the allegations contained in Paragraph 121 of the Complaint.

122.    Anthology denies the allegations contained in Paragraph 122 of the Complaint.

123.    Anthology refers to the cited May 13, 2015 correspondence for its contents, and otherwise denies the allegations contained in Paragraph 123 of the Complaint.

124.    Anthology refers to the cited April 25, 2017 document for its contents, and otherwise denies the allegations contained in Paragraph 124 of the Complaint.

125.    Anthology refers to the cited March 17, 2018 letter for its contents, and otherwise denies the allegations contained in Paragraph 125 of the Complaint.

126.    Anthology refers to the cited July 7, 2015 correspondence for its contents, and otherwise denies the allegations contained in Paragraph 126 of the Complaint.

127.    Anthology refers to the cited June 29, 2016 correspondence for its contents, and otherwise denies the allegations contained in Paragraph 127 of the Complaint.

128.    Anthology refers to the cited May 1, 2018 correspondence for its contents, and otherwise denies the allegations contained in Paragraph 128 of the Complaint.

129.    Anthology denies the allegations contained in Paragraph 129 of the Complaint.

130.    Anthology denies the allegations contained in Paragraph 130 of the Complaint.

131.    Anthology denies the allegations contained in Paragraph 131 of the Complaint.

132.     Anthology denies the allegations contained in Paragraph 132 of the Complaint.

133.     Anthology states that Paragraph 133 of the Complaint contains conclusions of law and/or argument to which no answer is required, admits that Adrian entered the Master Agreement, the First Statement of Work, the Second Statement of Work, the Addendum, and all other documents comprising the agreement between Anthology and Adrian, and otherwise denies the allegations contained in Paragraph 133.

134.     Anthology states that Paragraph 134 of the Complaint contains conclusions of law and/or argument to which no answer is required, and otherwise denies the allegations contained in Paragraph 134.

135.     Anthology denies the allegations contained in Paragraph 135 of the Complaint.

136.     Anthology denies the allegations contained in Paragraph 136 of the Complaint.

137.     Anthology denies the allegations contained in Paragraph 137 of the Complaint.

138.     Anthology denies the allegations contained in Paragraph 138 of the Complaint.

139.     Anthology states that Paragraph 139 of the Complaint contains conclusions of law and/or argument to which no answer is required, and otherwise denies the allegations contained in Paragraph 139.

140.     Anthology states that Paragraph 140 of the Complaint contains conclusions of law and/or argument to which no answer is required, and otherwise denies the allegations contained in Paragraph 140.

141.     Anthology admits that Adrian is making a request for attorneys' fees and costs, and refers to the Master Agreement, the First Statement of Work, the Second Statement of Work, the Addendum, and all other documents comprising the agreement between Anthology and Adrian for their contents.

142.     Anthology repeats and realleges its responses set forth above in paragraphs 1 to 141 as if fully set forth herein.

143.     Anthology states that Paragraph 143 of the Complaint contains conclusions of law and/or argument to which no answer is required, and refers to the Master Agreement, the First Statement of Work, the Second Statement of Work, the Addendum, and all other documents comprising the agreement between Anthology and Adrian for their contents.

144.     Anthology denies the allegations contained in Paragraph 144 of the Complaint.

145.     Anthology states that Paragraph 145 of the Complaint contains conclusions of law and/or argument to which no answer is required, refers to the Master Agreement, the First Statement of Work, the Second Statement of Work, the Addendum, and all other documents comprising the agreement between Anthology and Adrian for their contents, and otherwise denies the allegations contained in Paragraph 145 of the Complaint.

146.     Anthology states that Paragraph 146 of the Complaint contains conclusions of law and/or argument to which no answer is required, refers to the Master Agreement, the First Statement of Work, the Second Statement of Work, the Addendum, and all other documents comprising the agreement between Anthology and Adrian for their contents, and otherwise denies the allegations contained in Paragraph 146 of the Complaint.

147.     Anthology states that Paragraph 147 of the Complaint contains conclusions of law and/or argument to which no answer is required, refers to the Master Agreement, the First Statement of Work, the Second Statement of Work, the Addendum, and all other documents comprising the agreement between Anthology and Adrian for their contents, and otherwise denies the allegations contained in Paragraph 147 of the Complaint.

148.     Anthology denies the allegations contained in Paragraph 148 of the Complaint.

149.    Anthology denies the allegations contained in Paragraph 149 of the Complaint.

150.    Anthology states that Paragraph 150 of the Complaint contains conclusions of law and/or argument to which no answer is required, and otherwise denies the allegations contained in Paragraph 150 of the Complaint.

151.    Anthology denies the allegations contained in Paragraph 151 of the Complaint.

152.    Anthology denies the allegations contained in Paragraph 152 of the Complaint.

153.    Anthology states that Paragraph 153 of the Complaint contains conclusions of law and/or argument to which no answer is required, and otherwise denies the allegations contained in Paragraph 153 of the Complaint.

154.    Anthology states that Paragraph 154 of the Complaint contains conclusions of law and/or argument to which no answer is required, and otherwise denies the allegations contained in Paragraph 154 of the Complaint.

155.    Anthology admits that Adrian is making a request for attorneys' fees and costs, and refers to the Master Agreement, the First Statement of Work, the Second Statement of Work, the Addendum, and all other documents comprising the agreement between Anthology and Adrian for their contents.

### Response to Plaintiff's Prayer for Relief

Anthology denies all allegations not specifically admitted herein, and further denies that Adrian is entitled to the judgment and relief requested in Paragraphs "A." through "F." of the prayer for relief section of the Complaint or to any other relief.

### AFFIRMATIVE DEFENSES

### First Affirmative Defense

Adrian's Complaint fails to state a claim upon which relief may be granted.

### Second Affirmative Defense

Adrian's purported claims are barred by the doctrines of unclean hands and *in pari delicto*.

### Third Affirmative Defense

Adrian cannot recover under the claims alleged in the Complaint because it materially breached the agreements at issue.

### Fourth Affirmative Defense

Adrian's purported claims are barred by the doctrine of equitable estoppel.

### Fifth Affirmative Defense

Adrian's damages are precluded by the terms and conditions of the Master Agreement, the First Statement of Work, the Second Statement of Work, the Addendum, and all other documents comprising the agreement between Anthology and Adrian.

### Sixth Affirmative Defense

Adrian's purported claims are barred because it failed to perform under the Master Agreement, the First Statement of Work, the Second Statement of Work, the Addendum, and all other documents comprising the agreement between Anthology and Adrian.

### Seventh Affirmative Defense

Adrian's purported claims are barred because the representations on which Adrian's fraudulent inducement cause of action is based are true.

### Eighth Affirmative Defense

Adrian's purported claims are barred because Adrian could not justifiably rely on the representations on which Adrian's fraudulent inducement cause of action is based.

### Ninth Affirmative Defense

Adrian's purported claims are barred by the doctrine of frustration of purpose.

**Tenth Affirmative Defense**

Adrian's purported claims are barred by the doctrine of impossibility of performance.

**Eleventh Affirmative Defense**

Adrian's purported claims are barred because it failed to mitigate its damages.

**Twelfth Affirmative Defense**

Anthology reserves the right to present any additional defenses or counterclaims that discovery may reveal.

## COUNTERCLAIMS

Defendant Anthology brings the following Counterclaims against Plaintiff Adrian College pursuant to Federal Rule of Civil Procedure 13.

## INTRODUCTION

1.      Faced with millions in payments owed to Anthology for licensing its industry-leading education software over the course of the parties' agreement, Adrian improperly elected to terminate the agreement.  Then, to evade its contractual responsibility to pay a multi-million dollar termination fee owed to Anthology, Adrian falsely blamed Anthology for its troubled software implementation process, when in reality, such issues were caused by Adrian.  This ploy will not work, and Adrian's frivolous lawsuit does not relieve it from its obligation to pay the termination fee owed under the clear language of the parties' agreement.

2.      On May 18, 2018, Adrian contracted with Anthology's predecessor company, Campus Management Corp.,[1] to deploy and administer Anthology's industry-leading suite of software products and related services, including Anthology's flagship student information system, CampusNexus Student ("**CNS**").  CNS is a platform and interface for student information.

---

[1]    Campus Management Corp. and Anthology will both be referred to as "Anthology" herein.

It was (and is in its current form, "Anthology Student") recognized in the education software market as a top student information system. By May 2018 when Adrian and Anthology entered their agreement, Anthology had implemented CNS hundreds of times throughout the 20-year history of the product. In May 2018, more than 160 institutions were CNS clients, including a number of private, four-year institutions such as Adrian.

3.      CNS is a flexible software solution that, for example, can accommodate different curriculum formats and academic models. It is also highly customizable. The software can be adapted to meet the functional preferences of Anthology's clients.

4.      The agreement between Adrian and Anthology reflects that the parties must be partners in the implementation process, and the implementation could not be completed without Adrian's commitment to the process. Customized solutions, like the one Adrian specifically desired, require a commitment of time and energy by competent personnel on both sides—*i.e.*, Anthology's and Adrian's—to ensure that the product is configured correctly, presents complete and accurate data migrated from the predecessor student information system, and functions properly.

5.      Throughout the course of implementation, Anthology performed its obligations under its agreement, and went above and beyond to accommodate Adrian. Indeed, Adrian's management characterized Anthology as "honorable," "efficient," and appreciated the complexities of the implementation, noting that the implementation was "arguably the largest . . . undertaking in the history of Adrian College."

6.      But Anthology's ability to implement the product was strained because Adrian was unable to commit competent and dedicated resources to the implementation of CNS, resulting in

an extended project timeline.  Adrian failed to dedicate necessary personnel to the project at various points in time, resulting in over a year of delay.

7.      Moreover, the quality of Adrian's data was poor, as it was neither complete nor fully accurate.  Issues with Adrian's data presented data migration challenges that were certainly surmountable, but required time and cooperation between the parties.  Adrian acknowledged that the parties needed to work together.

8.      Compounding the issue, Adrian appointed purported subject matter experts—individuals who would be using the CNS software—to test and validate that the data was properly captured and that the system functioned properly, but not all of Adrian's purported subject matter experts cooperated.   Indeed, Adrian's Financial Aid team, in particular, frequently skipped meetings, failed to test data throughout the course of the implementation, refused to dedicate meaningful time to the project, and even refused to use CNS, insisting on an integration so that the Department could continue using predecessor software for its purposes.  The Financial Aid team's failure to cooperate resulted in issues affecting all other functions of Adrian's software implementation, due to their interconnectedness.  As a result, necessary work went undone, testing of CNS was incomplete, and the implementation was disrupted.

9.      The parties' initial "Go-Live" date—the date on which CNS would be rolled out at Adrian—was extended several times.  Adrian acknowledged that "a number of reasons" caused these extensions.   Those reasons included Adrian's failure to hire dedicated and competent information technology professionals to aid in the implementation, the refusal of Adrian's purported subject matter experts to cooperate, and the nature of the implementation itself, which required a significant time investment.  Adrian's managers appeared to appreciate the nature of the implementation process and signed off on every aspect of the implementation from inception

through summer 2021.  Indeed, Adrian even "chose[]" to extend the "Go-Live" date in June 2021 to December 2021 because it wanted to ensure that its personnel could commit the appropriate resources to completing the implementation.

10.     Adrian fell behind on its payments to Anthology.  Adrian was aware that under the terms of the parties' agreement, it would owe approximately $2,799,661.83 to Anthology throughout the remaining term of the parties' agreement, an amount that still remains outstanding. In an apparent attempt to save money, and in a stunning reversal from its previous position, Adrian began to accuse Anthology of causing delays in the implementation, and began making unreasonable demands.

11.     In an effort to accommodate Adrian, Anthology devised a game plan in the fall of 2021 to complete the implementation by February of 2022, less than two months later than the then-scheduled December 21, 2021 "Go-Live" date set at the time.  Anthology had committed an enormous amount of resources to Adrian's implementation in fall of 2021. As it had been throughout the implementation process, Anthology was fully committed to honoring its contractual obligations to Adrian.

12.     On or about October 14, 2021, Anthology informed Adrian that CNS should "Go Live" in February 2022, but Adrian refused this modest scheduling change, and terminated the parties' engagement.  Indeed, with only an estimated six additional weeks of work necessary for implementation, Adrian elected to terminate the Agreement with Anthology without cause instead of collaboratively working through the open issues.

13.     Adrian has not only refused to pay at least $2,799,661.83 it owes under its agreement with Anthology, but has filed this lawsuit in an effort to land a windfall from Anthology, and avoid its obligations under the agreement.  Adrian's behavior can only be explained as an ill-

conceived attempt to relieve the financial distress plaguing the institution. Indeed, after an unsuccessful attempt to cut academic departments in 2020, a senior Adrian official vowed to identify strategies to improve the school's financial condition. The administration apparently devised one such strategy: breaching Adrian's agreement with Anthology by failing to pay monies owed under the parties' agreement.

## PARTIES

14.    Plaintiff Adrian College is a private, non-profit liberal arts college organized under the laws of the state of Michigan with a principal place of business of 110 South Madison Street, Adrian, Michigan 49221.

15.    In or about July 2020, Campus Management Corp., Campus Labs and iModules merged to create Anthology, Inc. Anthology, Inc. is a for-profit corporation organized under the laws of the state of Florida with a principal place of business of 5201 Congress Avenue, Suite 220, Boca Raton, Florida 33487.

16.    Anthology, like its predecessor Campus Management Corp., is a company that provides various technological services and products to higher education institutes which, *inter alia*, help the institutions organize and synthesize internal data.

17.    Anthology is a leading provider of, among other things, cloud-based student information systems ("**SIS**"), customer relationship management ("**CRM**") software and enterprise resource planning ("**ERP**") solutions and services that transform higher education institutions. More than 1,000 institutions around the country subscribe to one or more of Anthology's products, including some of the nation's largest and most esteemed higher education institutions.

18.     Anthology had 6-8% of the U.S. market share for student systems, and was awarded dozens of contracts to implement CNS at educational institutions, in the years 2016-2019.   As of 2018, Anthology's CNS clients included 163 institutions (today, that number is around 261).

19.     The success and widespread use of CNS is no secret; Anthology invites its clients to an annual, multi-day user conference every year to discuss updates to the various products and liaise with one another.   During those conferences, hundreds of representatives from Anthology's clients come together to discuss their experiences with CNS and Anthology's other software products.   For example, in April 2018, only one month before Adrian and Anthology entered their agreement, Anthology hosted its user conference, then-named "CampusInsight."   Anthology invited Adrian representatives to that conference.   During the 2018 conference, Anthology devoted more than ten sessions to CNS, including several sessions led by Anthology's existing clients about their experiences during the implementation process.

20.     Anthology's success has only grown since the merger in 2020, and Anthology continues to be a leading provider of various educational software, including its student system, now known as Anthology Student.

## JURISDICTION AND VENUE

21.     Federal diversity jurisdiction exists pursuant to 28 U.S.C. § 1332.  Adrian College is a corporation organized under the laws of Michigan with a principal place of business in Michigan.  Anthology is a corporation organized under the laws of Florida with a principal place of business in Florida.  The amount in controversy, without interests and costs, exceeds the sum or value of $75,000.

22.    Venue in this Court is proper pursuant to 28 U.S.C. §§ 1391(b)(1) because, as detailed below, a substantial part of the events or omissions on which the claims are based occurred here.

23.    Additionally, the parties agreed to this Court's jurisdiction and venue in Section 16.2 of their Master Agreement, which stated that if the parties fail to resolve their differences, "each Party hereby agrees that any controversy or claim, whether based on contract, tort or other legal theory, arising out or relating to this Agreement, shall be maintained exclusively in the jurisdiction and venue of the courts sitting in and for Palm Beach County and the Southern District of Florida." *See* Exhibit A at 9, § 16.2.

## FACTUAL ALLEGATIONS

### I.    The Product

24.    In 2000, Anthology introduced CampusVue Student, a student information system that was a fully unified academic and administrative platform designed for higher education institutions of all types.

25.    Throughout the course of the 2000s and early 2010s, Anthology sold, implemented and supported the use of CampusVue Student for hundreds of clients.

26.    In 2014, CMC introduced CampusNexus, a modernized and integrated suite of software systems, featuring a modern cloud-based architecture.  The CampusNexus suite of products included, *inter alia*:: (1) CNS; (2) CampusNexus CRM ("**CNCRM**"); and (3) CampusNexus Finance, HR & Payroll ("**CNFHRP**").

27.    CNS was a renamed version of CampusVue Student that provided the same user functionality with a modernized architecture and a greater ability to interface with the other CampusNexus software systems.  CNS, like CampusVue Student, allowed higher education

institutions to organize and synthesize information, including, but not limited to, information regarding financial aid, tuition, enrollment status and history, grades, and dormitories.

28.     CNS is "the hub" of a school's "operations across the student lifecycle, from recruitment, admissions, academics, and financial aid, to career services, alumni relations, and more."  It allows a school to manage academic records, curriculums, student enrollment and progression.

29.     By 2018, dozens of Anthology's clients had transitioned from CampusVue Student to CNS.  Users of CNS included numerous private, non-profit colleges and universities.

30.     CNS, like the other CampusNexus products, is "open architecture," meaning it is adapted to the specific needs of the client through a cooperative exchange of data, which "enables easy integration with [the] client's existing systems."  Indeed, CNS is a flexible product in that it can support different academic delivery models, including, *e.g.*, varying term and semester lengths, online schools and in-person schools, and schools that track students' clinical hours versus those that track course credits.

31.     Like any significant software transition, the adoption by a higher education institution of CNS requires an implementation process during which CNS is configured, data is migrated and validated from the institution's previously used "legacy" student information system, and the institution's personnel learn to use the new software.  Implementation is significantly dependent on the customer's ability and willingness to participate in the process.

II.     **Pre-Agreement Communications between Anthology and Adrian**

32.     As early as 2015 through and including 2018, Anthology sent sales materials to representatives of Adrian, touting the company's proven track record, the powerful features of the CampusNexus suite of products, and their popularity with higher education institutions.

Anthology's communications offered general statements about Anthology and its products. Nearly all of these communications occurred before representatives from Anthology and Adrian had ever even spoken to one another, much less begun negotiations. Even so, Anthology was entirely truthful in its communications with Adrian, as it is with all prospective customers.

33. On May 13, 2015, Anthology's Mark Unrine emailed Adrian's Jerry Wright to introduce Adrian to Anthology's entire product catalogue. Mr. Unrine referred to Anthology's "proven, higher education-specific solution" and offered that CampusNexus could "provide tremendous value and results to Adrian College." Mr. Unrine explained that the CampusNexus product suite's unique user functionality, "[t]he ability to offer diverse delivery models," and the ability to "help[] manage top-line revenue" were three reasons why these products were "ideal" for Adrian. Indeed, Anthology had implemented its CampusNexus solution in scores of other institutions in which these were three of its features.

34. Anthology believed CampusNexus was a good fit for Adrian because increased competition among institutions of higher-learning had led to "increased competition for students," "expanding academic delivery models," and "diminished funding and a heavier emphasis of funding tied to demonstrable student outcomes."

35. On July 7, 2015, Anthology's Glen Forman wrote to Mr. Wright again, noting that Anthology "has worked with thousands of higher education institutions such as Adrian College providing education leaders with a way to streamline interdepartmental processes that provide cost savings and improve overall operational efficiency." Anthology had, in fact, worked with thousands of higher education institutions, successfully implementing its product offerings in higher education institutions throughout the course of the company's history. Anthology's CampusNexus suite of products offers powerful interface capabilities between the various products

to provide the cost savings and operational efficiency noted by Mr. Forman.   Indeed, CampusNexus was even able to integrate with non-Anthology products to interface and provide additional efficiencies.[2]

36.     On June 29, 2016, Anthology's Michael Farinello wrote to Mr. Wright that Anthology "currently partner[s] with several private and public MI [Michigan] institutions," and that Anthology wanted to "mak[e] a brief introduction to Adrian College," reflecting that Adrian representatives had never even communicated with Anthology before that time.   Mr. Farinello wrote that Anthology "work[s] with over 1,700 institutions worldwide and our solutions have proven to help with the recruitment/enrollment/retention of non-traditional students . . ."  These statements were accurate, as Anthology's client base included (and still includes) several public and private Michigan higher education institutions, and Anthology was working with over 1,700 institutions worldwide in 2016.   Anthology was also capable of helping with recruitment, enrollment, and retention of non-traditional students.  CampusNexus has been shown, across a variety of institutions, each with different needs and their own unique software architecture, to "impact enrollment and retention rates by as much as 42.5%" among schools that successfully implemented the CampusNexus suite of products.

37.     On April 25, 2017, CMC's Stephen Crocker wrote to Mr. Wright, explaining that the CampusNexus suite of products offers "the flexibility our customers need to accommodate the distinctive needs of their schools and students. . . .  [O]ur software's open architecture enables easy integration with our client's [sic] existing systems."  These statements relate to CampusNexus' unique ability to adapt to different academic delivery models and to interface with other platforms.[3]

---

[2]     Mr. Forman also referred to CNFHRP as a "flexible and agile solution."

[3]     Mr. Crocker also referred to another product, Talisma Fundraising, as a "highly flexible and scalable platform."

38.     In an undated 2018 letter, Anthology's Chief Executive Officer, Jim Milton, invited Adrian to attend CampusInsight to meet with Anthology's "associates and customers at our conference."   Mr. Milton described the conference as an opportunity "to learn how our [Anthology's] solutions and services help transform academic, delivery, student success, and operational efficiency across your institution."  Anthology's products were capable of such results, and Adrian was provided with this opportunity to learn exactly how it could achieve the same outcomes as Anthology's other clients.   The conference was scheduled for April 2018.   The itinerary for CampusInsight included a "customer experience panel" where Adrian was permitted to "ask questions of a variety of client executives about their experiences as members of the Campus Management client community."

39.     In late April 2018, Adrian was considering whether to contract with Anthology.  On April 27, 2018, Mr. Wright asked Stephen Crocker for the "[t]otal number of Campus Management higher education clients" and the "[t]otal number of Campus Management higher education clients on CampusNexus CRM."  Mr. Crocker responded with the numbers 1,017 and 97, respectively. On May 1, 2018, when Mr. Crocker responded, those numbers were correct.

**III.     The Master Agreement**

40.     On or about May 18, 2018, Adrian and Anthology executed a Master Agreement for Software as a Service (SAAS), a license of software and Professional Services (the "Master Agreement").  Exhibit A.

        A.     <u>The Nature of the Products</u>

41.     The Master Agreement provided that Anthology would "deploy and administer the" CNS, CNCRM, CNFHRP, and Talisma Fundraising software "to and for the benefit of [Adrian] in accordance with the terms of this Agreement, all Schedules, and Exhibits hereto, and use

industry practices and methods to provide" the products to Adrian.  Exhibit A at 3, §§ 3.1-3.2, 12-13, Ex. A-1.

42.     Due to the ever-evolving nature of software products, Adrian acknowledged in the Master Agreement that Anthology's software may change in significant ways throughout the course of its license of Anthology's software.   Adrian acknowledged Anthology's rights to "reengineer CMC [Anthology] network components or infrastructure," "modify and/or replace technology or service architectures relating to the services," and "change, discontinue or deprecate the CMC SaaS [the software products licensed by Adrian] or change or remove features or functionality of the CMC SaaS from time to time." Exhibit A at 3, §§ 3.4, 3.5.  In essence, Adrian acknowledged that Anthology's products, as is the case with all software, are not static; Adrian purchased a license to use Anthology's software products, including CNS, in the forms they existed at the time the Master Agreement was executed, and as they evolved throughout the course of the license's term.

    B.     Adrian's Responsibility to Cooperate

43.     Adrian was responsible for "appoint[ing] a relationship manager to manage the relationship established by" the Master Agreement.  Exhibit A at 3, § 4.4.

44.     The Master Agreement contemplated a collaborative process for the implementation, integration and other services provided by Anthology (defined as "Professional Services" in the Master Agreement, *see* Exhibit A at 4, § 5), during which issues would arise and be resolved collectively by managers of Adrian and Anthology.  Adrian and Anthology were required to each "appoint a representative to act as its designated representative and liaison for the Professional Services being performed by CMC [Anthology] for Customer [Adrian].   Status

31

review meetings or teleconferences may be held on a periodic basis . . . in order to review the status of Professional Services and to resolve any related issues." Exhibit A at 4, § 5.6.

45.     Indeed, successful implementation of the product required Adrian's diligent cooperation. The Master Agreement stated that Adrian "shall provide [Anthology] with all technical data and all other information [Anthology] may reasonably request from time to time to allow [Anthology] to supply the [software] to [Adrian]. All information [Adrian] supplies will be complete, accurate and given in good faith." Exhibit A at 3, § 4.1.

C.     Fluidity of the Implementation Timeline

46.     Implementation is different for each client. Thus, the Master Agreement reflects flexibility as to the timing of the implementation. For example, there is no contractual "Go-Live" date on which the products would be rolled out.

47.     In fact, the parties recognized that "all work schedules of a relevant Statement of Work shall be considered reasonably accurate estimates, *subject to revision*." Exhibit A at 4, § 5.1 (emphasis added).

48.     Adrian also acknowledged that "there may be a reasonable amount of [personnel] attrition outside of CMC's [Anthology's] control" and Anthology made the commitment to "use commercially reasonable efforts to provide substitute personnel of appropriate qualifications subject to availability of such personnel." Exhibit A at 10, § 23.3.

49.     The Master Agreement provided that changes to the statements of work requested by Adrian "may affect time and/or costs." Exhibit A at 4, § 5.2.

50.     The Master Agreement further provided that "[Anthology's] ability to deliver the services depends upon [Adrian's] full and timely cooperation, dedication of skilled resources, as well as the accuracy and completeness of any information [Adrian] provides." If Adrian failed to

perform its obligations and the failure "causes a delay in [Anthology's] performance of its obligation hereunder which reasonably relies on [Adrian's] timely cooperation and performance, the period of time for [Anthology's] performance shall be extended proportionately, and additional costs may be incurred by [Adrian]."  Exhibit A at 3, § 4.8.

        D.     <u>Adrian's Payment Obligations</u>

51.     In signing the agreement, the parties agreed that Anthology would bill Adrian "monthly by the 10th of the following month and [Adrian] shall pay [Anthology] in full on or before the fifteenth (15th) day following the date of the invoice."  Exhibit A at 4, § 6.2.

52.     Adrian agreed that "[a]ny amount invoiced pursuant to this Agreement and not paid in full as required herein shall bear interest at the lesser of 1.5% per month or the highest rate allowable by applicable law, and shall be subject to reasonable costs and attorney's fees related to collection."  Exhibit A at 4, § 6.5.

53.     In the event of cancellation or termination of the Master Agreement by Adrian "for any reason, other than because of [Anthology's] uncured breach, [Adrian] must pay [Anthology] for the full amount of the fixed fee specified in the statement of work." Exhibit A at 3, § 5.1.

54.     The Master Agreement permits Adrian to terminate "early upon sixty (60) days' written notice and payment of early termination fee as set forth in Exhibit A-1."  Exhibit A at 5, § 8.2(a)(iii).  Exhibit A-1 to the Master Agreement states, "[if] [Adrian] terminates this Agreement for convenience by providing written notice to [Anthology] in accordance with Section 8.2(a)(iii) of the General Terms, . . . then [Anthology] shall retain all payments and [Adrian] shall promptly pay to [Anthology] all amounts it is obligated to pay under this Exhibit for the remainder of the Term."  Exhibit A at 12.

55.     Payments in accordance with Exhibit A-1 "are payable for each six month period from June through November on October 15 of each year, and from December through May on February 15 of each year."  Exhibit A at 13.

56.     In addition to the termination fee, Adrian was required, upon termination, to pay for services previously rendered as the Master Agreement stated that "any termination or cancellation shall have no effect on [Adrian's] obligation to pay the applicable fees and out-of-pocket expense actually incurred by [Anthology] for Professional Services that are rendered through the effective date of termination or cancellation."  Exhibit A at 4, § 5.5.

57.     The Master Agreement also provides that in the event that a party submits a dispute to a proper court, the "prevailing Party shall be entitled to reimbursement of reasonable attorneys' fees and costs."  Exhibit A at 9, § 16.2.

**IV.     The First Statement of Work**

58.     On or about May 18, 2018, the parties entered into the First Statement of Work (the "**First Statement of Work**").  In the First Statement of Work, Anthology committed to implementing, among other things, a customized version of CNS.  As part of the implementation, Adrian had "the opportunity to review the tasks as they are completed during implementation." Exhibit B at 5.  Adrian also would "participate in a demonstration to validate the requirement has been met and officially sign off." *Id.*

59.     The First Statement of Work stated that "[Anthology's] ability to deliver the services specified in this SOW depends upon [Adrian's] full and timely cooperation, availability of skilled resources, as well as the accuracy and completeness of any information [Adrian] provides. In the event of a failure of any of the foregoing, or if any assumptions specified in this

SOW change or are inaccurate, then the scope of services, duration and costs may change." Exhibit B at 5.

60.     Indeed, the First Statement of Work assigned numerous responsibilities to Adrian for the implementation of CNS and the other products.  For instance, the First Statement of Work stated that it was Adrian's responsibility to "assemble Data Migration teams, to perform data extract coding to populate the common file format. . . . [And] [Anthology] assumes that [Adrian] can extract all legacy source system data in a defined and repeatable format."  Exhibit B at 6.

61.     The First Statement of Work provided that Adrian would "establish a team of Subject Matter Experts ("SMEs") to serve as points of contact for all objectives and business processes related to" the First Statement of Work.  Exhibit B at 5.  Subject matter experts are Adrian personnel that would be using Anthology's software products, and who would participate in testing to identify issues in the configuration, the data migration, and the overall functionality of the products.  Adrian promised that its subject matter experts would "be accessible for the project life cycle." *Id.*

62.     Adrian was also required to "establish development resources adept at integration analysis and development coding as required."  Exhibit B at 5.

63.     Adrian was further responsible for "providing data from each of the source systems into a common format for all sources systems (which will be in a database) as per the timeline defined in the project schedule."  Exhibit B at 6. Adrian was responsible "for the accuracy and validation of its data." *Id.*

64.     Relatedly, Adrian was responsible for, "extracting demographic, applicant, transcript, ledger card, and financial aid data from its legacy student information(s) and providing the data to [Anthology] in the required format."  Exhibit B at 7.

65.     The project schedule and "exact timeframes for service delivery will be dependent upon the availability of [Anthology] and [Adrian] resources." Exhibit B at 8.  The First Statement of Work provided that Anthology and Adrian would "coordinate the actual start date after full execution of the SOW."  *Id.*

66.     Notably, payment was not conditioned on completion of the project schedule reflected in the First Statement of Work. Instead, Adrian was required to pay Anthology according to the Estimated Fees and Fixed Fees schedule.  Exhibit B at 9.

**V.     The Second Statement of Work**

67.     On or about May 18, 2018, the parties entered into the Second Statement of Work (the "**Second Statement of Work**").

68.     The Second Statement of Work stated that Anthology's "ability to deliver the services depends on [Adrian's] full and timely cooperation, dedication of skilled resources, as well as the accuracy and completeness of any information [Adrian] provides.  In the event of a failure of any of the foregoing, or if any assumptions herein change or are inaccurate, then the scope of services, duration and costs may change."  Exhibit C at 1.

69.     The Second Statement of Work further stated that "[t]he exact timeframes for service delivery will be dependent upon the availability of [Anthology] and [Adrian] resources. . . . [Adrian] and [Anthology] will coordinate the actual start date.  It is assumed that the services defined in this SOW will be delivered at a mutually agreed time after full execution of this SOW." Exhibit C at 2.

70.     Once again, payment was not conditioned on completion pursuant to the Second Statement of Work's project schedule.  Instead, Adrian was required to pay Anthology "on October 15 and February 15 of each year." Exhibit C.

## VI.    Other Contractual Documents

71.    On May 26, 2020, the parties signed a third Statement of Work (the "**Third Statement of Work**"), for the provision of a packaged integrated solution, CampusLink eLead Express (the "Lead Package"), to process electronic leads transactions between third party vendors and CNS.  Exhibit D at 2.  Like all changes to the scope of the project, the Third Statement of Work extended the project timeline.

72.    On March 5, 2021, the parties signed a fourth Statement of Work (the "**Fourth Statement of Work**") for the provision of certain consultation services.  *See* Exhibit E at 1

73.    The parties also entered a Change Order (the "**Change Order**"), effective as of January 10, 2020.  Pursuant to the Change Order, Anthology agreed to help Adrian create data migration scripts to extract financial data from its legacy financial platform and transfer it to the CNS system.  Exhibit F at 2.

74.    Together, the Master Agreement, the First Statement of Work, the Second Statement of Work, the Third Statement of Work, the Fourth Statement of Work, two Addenda to the Master Agreement for Software as a Service, Software, and Professional Services (the "**Addenda**," Exhibits G and H), and the Change Order constitute the "**Agreement**" between the parties.

## VII.   The Payment Schedule

75.    Soon after executing the Agreement in May 2018, Adrian put the implementation on hold due to the departure of its Director of Information Technology, who would be critical in the process.  For a full year or more, Adrian's failure to hire a suitable replacement resulted in a delay of the implementation.

76.     During that period of inactivity, in or about January 2019, Adrian sought modification of the payment schedule set forth in the Master Agreement and Statements of Work.

77.     On January 17, 2019, seeking to memorialize an agreement on the payment schedule modification, Jerry Wright, Adrian's Vice President of Business Affairs, emailed Anthology stating "[a]s I understood, previously you agreed to push the scheduled payments under Exhibit A-1 by one year to begin October 2019.  This would then be $101,073 paid twice per year on OCT-15 and FEB-15 through February 2024 ($101,073 X 10 payments = $1,010,730).  Under Exhibit A-1 I would like to propose that payments begin October 2020 equal to $126,341.25 through February 2024 ($126,341.25 X 8 payments = $1,010,730).  Under this proposal we would increase the periodic payments by $25,268.25 (from $101,073 to $126,341.25) and the sum total of payments through February 2024 would equal the same dollar amount of $1,010,730 that was previously acceptable to you.  We don't have to adjust term." *See* Exhibit I.

78.     Anthology accepted this proposal on January 22, 2019 stating, "[w]e can accept your revised proposal below."  Exhibit I.

79.     On January 31, 2019, Mr. Wright emailed Anthology again attaching a PDF containing an updated payment schedule and thanking Anthology for its "flexibility on this."  The email further stated that Anthology had "been very honorable in re-negotiating these payment terms.  We will be hiring a new Director of Information Technology soon and are fully committed to our relationship with Campus Management and are excited with [the] prospect of leveraging these new technologies in the not-too-distant future!"  Exhibit I.

## VIII.   Adrian's Lack of Dedicated and Skilled Resources Doom the Implementation Process

80.     In August 2019, after over a year of delay resulting from Adrian's failure to hire a Director of Information Technology, the parties began the implementation process of CNS.  Adrian instructed Anthology that it wanted to implement CNS before the other products Adrian had

licensed.   Adrian never attempted the implementation of CNCRM, CNFHRP, or Talisma Fundraising.

81.    Consistent with its obligations under the First Statement of Work, Anthology had a "Kickoff" for the CNS implementation process (*see* Exhibit B at 4), during which Anthology and Adrian discussed the project's scope, goals and objectives, project governance, project timeline and implementation methodology.   Anthology dedicated a point of contact for Adrian, and conducted a "lifecycle review" of CNS, designed to educate Adrian about the implementation process.  The "Kickoff" was completed on or around October 9, 2019.

82.    The First Statement of Work describes the next stage of implementation, which required Anthology to develop and deliver a project to Adrian for review and approval, conduct a FIT Gap Analysis (*i.e.*, an analysis that determines ways in which the "out of the box" CNS can meet the business process requirements of Adrian, and ways in which workarounds or customizations are needed to fill in "gaps"), create solution user stories, and generate a Solution Requirements Document to outline the functional and technical requirements of the system, prior to configuration.  This process is designed to ensure that the implementation of CNS can meet the business requirements of Adrian.  Anthology completed all aspects of this solution discovery phase of the implementation process on or around December 20, 2019.

83.    The First Statement of Work outlines the third phase of the implementation, which is the "construction phase."   As part of this phase, Anthology is required to "[c]omplete all configuration, data migration, and coding for solution," "[p]rovide detailed testing plans and conduct testing," and "[r]esolve any coding and solution issues identified in testing."  (Exhibit B at 5.)  Anthology began this phase of the implementation in December 2019.

84.     The duration of the "construction phase" of implementation largely depends on whether Anthology's client has appropriate information technology professionals and subject matter experts dedicated to the project, (1) to communicate with Anthology about the status and issues with the project, (2) to provide accurate and complete data, (3) to validate data during the spin process, and (4) to extract data in a defined and repeatable format.

85.     The duration of the phase also depends on the complexity of the customizations requested by the client, any changes to specifications requested during the implementation, and the volume and significance of any gaps between the "off the shelf" version of CNS and the business requirements of a particular client.  For these reasons, the Agreement contains no date on which the implementation will be completed and ready to "Go-Live," and the First Statement of Work expressly states that project timelines "depend upon the availability of" the parties' "resources."  Exhibit B at 8.

86.     Anthology and Adrian contemplated an initial "Go-Live" date, *i.e.*, the live roll out to Adrian's students and personnel, in summer of 2020.  The parties did not meet that "Go-Live" date for several reasons.

87.     First, Adrian did not dedicate the resources necessary for the implementation.  For example, there was a months-long gap in communication with significant Adrian personnel in late 2020 resulting in delay of the implementation.  This was in addition to the year-long delay of implementation beginning in May 2018.  The project schedule was repeatedly extended to accommodate the schedules of Adrian personnel, who could not focus their attention on the CNS implementation at various times.

88.     Second, Adrian information technology professionals also caused delay because they did not provide accurate and complete data in a timely or competent manner.  Indeed, data testing revealed significant deficiencies in the quality of Adrian's data.

89.     Third, while some of Adrian's employees diligently performed data validation tests to ensure that the data migration from Adrian's old student information system was formatted and functioning properly in CNS, and that the data was presenting as it should, others consistently failed to perform.  Most notably, Adrian's Financial Aid team refused to meaningfully participate in data validation testing, which made it impossible for Anthology to understand whether the configuration and data migration was successfully performed.

90.     Under the leadership of Adrian's first Director of Financial Aid, the Financial Aid team performed minimal data validation testing that was not sufficient to properly evaluate data. The situation further deteriorated when a second Director of Financial Aid was hired, who refused to participate in data validation testing at all.

91.     The Financial Aid team frequently missed meetings and did not commit adequate time to the CNS implementation.  In spring of 2021, the Financial Aid team's lack of engagement had become such a significant roadblock to completing the CNS implementation that Adrian leadership insisted that the Financial Aid team participate in weekly meetings with Anthology personnel.  Even after Adrian leadership's directive, the Financial Aid team continued to frequently miss meetings.  The Financial Aid team also refused to devote more than one hour per week to the CNS implementation for much of the implementation's duration.

92.     Adrian's Financial Aid team was so resistant to the CNS implementation that it requested an integration of CNS with its legacy PowerFAIDS software, because the Financial Aid team refused to use CNS.  Even after requesting the integration—which in itself would require

more Anthology resources that were not contemplated in the Agreement—Adrian then failed to provide Anthology with the necessary information required to complete the integration.

93.     The Financial Aid team's refusal to cooperate during the implementation had a cascading impact on the work of other CNS subject areas.  The Financial Aid functions in CNS interface with other functions in other areas.  Consequently, the failure to validate data in one area impacted functionality across the board.  This had a deleterious effect on Anthology's ability to resolve coding and solution issues that were not being tested.

94.     During the implementation, Adrian's managers appeared to recognize the difficulties of implementation caused by Adrian's lack of commitment.  In June 2021, Adrian's Jerry Wright wrote to Adrian's personnel, copying Adrian's President Docking, reminding them that "[t]his technology transition is arguably the largest such undertaking in the history of Adrian College."  Exhibit J.  Adrian agreed to several extensions of the "Go-Live" date without complaint, from August 2019 to December 2020, to May 2021, to June 2021, and to December 2021.

95.     In fact, in June 2021, it was Adrian, not Anthology, that "chose[] to delay" the "Go-Live" date to December 2021, because Adrian did not want to be "premature in 'flipping the switch.'"  Exhibit J.

96.     Despite Adrian's lack of resources and the unique complexities of the implementation, Anthology's dedicated team honored its commitments in the Agreement, and made significant progress toward completing the implementation.  Anthology was able to conduct several "spins" to identify and resolve configuration, data and functionality issues.  Each spin added new tests to identify issues with different data and user functions.

97.     Adrian acknowledged the diligent and superior quality of Anthology's work in the face of uncooperative Adrian personnel.  In one such example, in May 2020, Adrian's Project Lead reflected that a key Anthology employee involved in the implementation was "very efficient."

98.     Adrian's Jerry Wright also wrote of the superior capabilities of Anthology's CNS, writing that "[t]his migration will streamline many internal processes while creating a much improved user experience for students and their families."  Exhibit J.

99.     But by the end of summer 2021, when the implementation was close to the finish line, Adrian's management grew frustrated with the process.  Despite repeated acknowledgements that the extensions of the "Go-Live" date were necessary and due to a "number of reasons" (including those resulting from Adrian's conduct), Adrian became adversarial, making unreasonable demands of Anthology.  Adrian insisted that the December 2021 "Go-Live" date remain in place, despite Adrian's continued failure to perform testing and issue resolution tasks, as necessary.

100.    Due to the complexity of the implementation, and Adrian's growing concern about the timing of the "Go-Live" date, Anthology assigned additional personnel to Adrian's implementation.   Anthology's Chief Operating Officer and Vice President of Professional Services, devoted significant time to Adrian, meeting with Adrian's staff several times a week.  Anthology had a game plan in place to complete the testing process and "Go-Live."  The plan, however, required the commitment of both Adrian and Anthology personnel, and a modest extension of the "Go-Live" date from December 2021 to February 2022.

101.    Anthology presented its plan to Adrian in October 2021.  Adrian promptly terminated the Agreement without cause.  Exhibit K.

## IX.    Adrian's Breach of the Agreement

102.    Prior to the second half of 2021, Adrian had approved every step of the implementation process, from the "Kickoff" completion, to the data solution phase, to the various spins, and extensions of the project timeline.   Adrian's personnel acknowledged that its own conduct resulted in some of the "delay," and also acknowledged that the implementation was a significant undertaking that simply required time and attention to complete.

103.    In the second half of 2021, Adrian's President Jeffrey Docking suddenly decided to become more involved in Adrian's relationship with Anthology.   Faced with a financial crisis at Adrian College and exploring different strategies to improve Adrian's financial position, exiting the relationship with Anthology apparently was one method pursued.

104.    Accordingly, conjuring up a legal claim to evade its responsibility to pay a termination fee and, on top of that, to extract money from Anthology would be a basis to improve Adrian's financial position.   Indeed, the allegations presented in Adrian's Complaint do not resemble reality, nor do they align with the views expressed by Adrian's personnel throughout its relationship with Anthology.

105.    Anthology always complied with its contractual obligations, and went above and beyond to provide exceptional service to Adrian.

106.    Adrian's termination of the Agreement was "without cause."   As a result, the Agreement requires Adrian to pay all amounts owed for the remainder of the term.   *See* Exhibit A at §§ 5.1, 5.5, 8.2(iii), at 12.

107.    Adrian has not made contractually required payments totaling at least $2,799,661.83.

## CAUSES OF ACTION

## COUNT I

### Breach of Contract

108.     Anthology repeats and realleges the allegations in each and every Counterclaim paragraph as if fully stated herein.

109.     Anthology and Adrian are parties to the Agreement.

110.     Anthology has at all times fulfilled its obligations under the Agreement.

111.     Adrian terminated the Agreement without cause, and is contractually obligated to pay Anthology for services rendered, and a termination fee provided for in the Agreement.

112.     Adrian breached the Agreement in a variety of ways, as alleged above, including by refusing to pay such fees to Anthology owed pursuant to Section 8.2(a), and Section A to Exhibit A-1, of the Master Agreement, in an amount totaling at least $2,799,661.83.

113.     Adrian's breach was deliberate.

114.     As a direct result of Adrian's breach and unlawful conduct, Anthology has been damaged and Adrian is therefore liable to Anthology in an amount to be determined by the Court, together with costs, interest and attorneys' fees as allowable by law.

## COUNT II

### Unjust Enrichment

115.     Anthology repeats and realleges the allegations in each and every Counterclaim paragraph as if fully stated herein.

116.     Anthology conferred a benefit on Adrian by deploying and administering CNS without being paid in full for services rendered.

117.     Adrian has retained and/or will retain that benefit, to Anthology's detriment, in a manner in which the result is unconscionable.

118.     Due to its actions, Adrian has been or will be unjustly enriched at the expense of Anthology.

119.     Adrian is therefore required to make restitution to Anthology for such unjust enrichment.

120.     As a direct and proximate result of Adrian's unlawful conduct, Anthology has suffered and/or will suffer damages.

121.     As a consequence thereof, Adrian is liable to Anthology in an amount to be determined by the Court, together with interest, costs and attorneys' fees to the extent permitted by law, and injunctive relief.

## PRAYER FOR RELIEF

WHEREFORE, Anthology respectfully requests that this Court:

1.     Enter judgment in favor of Anthology and against Adrian on all Counts;

2.     Order Adrian to pay damages to Anthology in an amount determined by the Court, including all costs, interest, and attorneys' fees allowed by contract and/or law;

3.     Award Anthology reimbursement of its reasonable attorneys' fees and costs pursuant to Section 16.2 of the Master Agreement; and

4.     Grant Anthology such other and further relief as the Court deems just and equitable.

**NELSON MULLINS RILEY &
SCARBOROUGH, LLP**
*Attorneys for Anthology, Inc.*


*/s/  Nicolette C. Vilmos*
**NICOLETTE C. VILMOS, ESQ.**
Florida Bar No. 0469051
390 North Orange Avenue, Suite 1400
Orlando, Florida 32801
Telephone: (407) 839-4200
Facsimile:  (407) 425-8377
nicolette.vilmos@nelsonmullins.com
allison.abbott@nelsonmullis.com

**KATTEN MUCHIN ROSENMAN LLP**

David A. Crichlow (*Pro Hac Vice* pending)
Mark T. Ciani (*Pro Hac Vice* pending)
Margaret J. McQuade (*Pro Hac Vice* pending)

50 Rockefeller Plaza
New York, NY 10020-1605
Telephone: (212) 940-8800
david.crichlow@katten.com
mark.ciani@katten.com
margaret.mcquade@katten.com

## **Certificate of Service**

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using CM/ECF on May 17, 2022.  I also certify that the foregoing document is being served this day on the following counsel of record via transmission of Electronic Filing generated by CM/ECF:

Aaron M. Phelps, Esq.
Gage M. Selvius, Esq.
Varnum LLP
P.O. Box 352
Grand Rapids, MI 49501
amphelps@varnumlaw.com
gselvius@varnumlaw.com
*Attorneys for Plaintiff*

Joseph A. Bare, Esq.
Varnum LLP
999 Vanderbilt Beach Road, Suite 300
Naples, FL 34108
jabare@varnumlaw.com
*Attorneys for Plaintiff*


                                        */s/ Nicolette C. Vilmos*
                                            Attorney


4868-4555-3184